## The R. R. Kirkland.

### Maltby v. The R. R. Kirkland.

*(District Court, E. D. Virginia. January 7, 1880.)*

1. Collision—Tug and Sail—Duty of Tug.
   On a night of moderate darkness, and in the open sea, a tug struck a schooner on her starboard side forward, probably at an acute angle. The tug's lookout and pilot, who saw the schooner from a minute and a half to two minutes before the collision, and at a distance of over 500 yards, testified that she showed no lights, and they supposed she was going the same direction with themselves; but the helm was not ported or the engineer signaled until an instant before the contact. The schooner's crew testified that her lights were up. *Held* that, under the rules requiring steam-vessels to keep out of the way of sailing vessels, and to stop and reverse if necessary when approaching another vessel, and requiring an overtaking vessel to keep out of the way of the vessel preceding her, the tug was in fault, irrespective of the question of the lights.

2. Same—Evidence—Admissions of Lookout.
   Unsworn admissions made by the lookout of a vessel the day after a collision are inadmissible as evidence to charge the vessel with fault.

3. Same—Duty of Lookout.
   When the lookout of a steamer resorts to the pilot-house, he subjects himself to the suspicion that he is there largely for his own comfort.

In Admiralty. Libel by O. E. Maltby against the steam-tug R. R. Kirkland for damages for a collision. Decree for libelant.

*Sharp & Hughes*, for libelant.

*Ellis & Thom*, for respondent.

Hughes, J. The schooner J. J. Housman set sail from Norfolk on the morning of the 8th September, 1879, at or about half-past 1 o'clock,

on a fishing expedition to the Chesapeake bay. Her crew was a captain, a mate, a man before the mast, and a cook; and she also had on board three fishermen, a book-keeper, and one passenger. One of the fishermen, Roy Thomas, acted as lookout in the forward part of the vessel throughout the trip. This night was moonlight, but not bright; the moon had entered her last quarter at 10h. 33m. P. M. on that night. There were frequent fleeting clouds. The vessel proceeded through Hampton Roads into the Bay, and at about 4 A. M. was moving in a northerly course, heading a little to the westward of York Spit light, making eight miles an hour, with a fresh breeze from about south-west, when she came in collision with the steam-tug R. R. Kirkland, which struck her on her starboard side, forward of amidships, probably at an acute angle of about 30 deg., by which her hull was broken into, and she was sunk at the place of collision. The testimony of her lookout, Thomas, is positive, and particular that her lights were both up and burning brightly. The testimony of her master, Garrison, corroborates Thomas in so far as it asserts that the red light, which was the only one visible from her wheel where he was standing, was up and burning. The testimony of several persons on board of her is that they saw the lights put up in good order and in proper position as the vessel was leaving Norfolk harbor at half past 1 A. M. On the other hand, the testimony of the pilot, the engineer, and the fireman on the tug is equally positive that when they came in sight of the schooner, one and one-half to two minutes before the collision, they saw no light, especially on that side of the vessel not hidden from them by her sails.

Just before the collision the tug was moving nearly due south at the speed of nine knots an hour, and shortly before the moment of collision the pilot, Dougherty, had ported his helm. The master of the tug, Lowell, had, about 25 minutes before, laid down in the rear part of the pilot-house to sleep. He was aroused when the vessels were nearly in contact, and gave four bells to the engineer just at the time of the collision. The mate, Daniels, who was the tug's lookout, had been in the pilot-house during the captain's nap, and would seem, from the pilot's testimony, to have seen the schooner before the pilot saw her, one and one-half to two minutes before the collision, and had given no signal to the engineer. The evidence of the men on the schooner is that the night was light, but not bright; that of the men on the tug is that it was dark, but not very dark.

I am to consider and decide the case on the statement I have thus drawn up from the testimony, variant as to the character of the night, and directly contradictory as to the question whether the red and green lights of the schooner were properly placed and burning. I will add that the lights of the tug were as they should have been under the rules of navigation. I will premise that I have rejected the evidence of Sharrett as to what he saw as an expert when he went on board the Housman in the harbor at Norfolk on the night before his testimony was taken, (28th November, 1879,) on the point whether the lamps could be seen from the helm when up in their proper places. I will not say

that under all circumstances I would reject such testimony, but it is .of the character of hearsay, cannot be subjected to proper restrictions, and ought generally to be discarded.    Though I consented at the hearing of the argument to treat as evidence the mere fact that Daniels, the lookout, who was not sworn as a witness in the case, made statements the day after the collision prejudical to the respondent, declaring at the time that it would have little weight with the court, I have changed that opinion, and think all testimony as to Daniels' admissions after the collision should be stricken out, and disregarded.    I have given them no consideration whatsoever in considering the other evidence.    In regard to the question of the proper place for a lookout on a tug-boat of the size and build of the Kirkland, I hold here, as I did in *The Kallisto Case;* 2 Hughes, 142, that he ought to be at such moment just where he can best make proper observations as a lookout at that moment, whether it be in or out of the pilot-house.    I am inclined to think, from the evidence in this case, that the pilot-house is as good a place for observation as any in a steam-tug; and shall not rule that Daniels, the lookout here, was at fault from the mere fact of being there in this instance. But in general, when the lookout of a steamer resorts to the pilot-house; he subjects himself to the suspicion that he is there largely for his own comfort, and I do not think the courts will or ought to encourage the proposition that the pilot-house, even of a tug, is the right place for a lookout.

I come now to consider the case on that scant part of the testimony which is undeniable, and which I have embodied in the statement of the case which I have made above.    The case turns upon the following laws of navigation.    Before 1864, these were not laws imperative and binding upon navigators and courts, but were rules of prudence, recommended by the experience of navigators, and enforced in cases of breach more or less gross by the courts.    They are now statutory laws of navigation enacted by congress, and by the legislatures of all commercial countries, which navigators are commanded to observe, and which courts have no option but to enforce, unless in cases coming clearly under rule 24, which allows a departure from them only where it is necessary to avoid immediate danger.    These rules of law governing the case at bar are as follows:

"Rule 20. If two vessels, one of which is a sail-vessel and the other a steam-vessel, are proceeding in such directions as to involve risk of collision, the steam-vessel shall keep out of the way of the sail-vessel.

"Rule 21. Every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse," etc.

"Rule 22. Every vessel overtaking any other vessel shall keep out of the way of the last-mentioned vessel.

"Rule 23. Where by rules 20 and 22, one of the two vessels shall keep out of her way, the other shall keep her course," etc.

The fact whether the schooner's sailing lights were up or not, being unascertainable from the direct evidence respecting the lights, the case turns upon other points affected by the rules of law just quoted.

. The defense of respondent is that, when the schooner was seen, the crew of the tug saw no lights, and concluded that the schooner was moving in the same direction as themselves; that is to say, that the tug was "overtaking" the schooner. The tug's duty, therefore, was, under rule 22, to keep out of the way of the schooner; to do everything necessary to that end; and the question arises, did the tug do everything or do anything to insure her keeping out of the way of the schooner? The testimony is that she did not port her helm until just before, or strike her four bells until just at the time of, the collision; although, as the testimony also shows, she saw the schooner one and a half to two minutes before the collision. At a minute and a half before, the vessels, one of them moving eight miles and the other nine miles per hour, were 547 yards apart; yet during the interval, according to the account given by Dougherty, the tug's pilot, the following is what occurred:

"Mr. Daniels [the lookout and mate] was sitting on the starboard side of the wheel-house. I put my hand on the window to look out for Back River light. Daniels asked me if I saw the light plain. I said, 'Yes.' Daniels asked me if I saw that vessel. I told him that I saw something like a vessel, —a loom of a vessel. He then asked me if I saw a light, and I told him, 'No.' He then said, 'I can't see any light;' and he had night glasses in his hands. He asked me if I thought which way she was going; and he said she must be going to the southward, the same as we are, because I see no lights. So he stated to me to keep off inshore, to go inside of him, and give the right of way. I done so, and before we had time to get one move [of the wheel] the vessel was coming right across our bows. Mr. Daniels then called Captain Lowell from the lounge where he was lying or sitting,—I don't know which,—and Captain Lowell pulled the bell to back the boat immediately. As soon as the bells were struck we were into the vessel."

This same witness (the pilot, Dougherty) says, in another place, that the helm was ported about one minute—not exceeding two minutes—before the bells were struck. It is evident from this statement that Daniels had seen "that vessel" before Dougherty did, and called his attention to it; and that some conversation—apparently leisurely conversation—had occurred between them before the helm was ported; and, further, that they were so slow in porting the helm that the schooner "was right up across our bows before they had time to get one move of the wheel in porting."

. Now, it seems to me, from the foregoing, that, on the supposition that the tug was "overtaking" the schooner, the men in charge of the tug, Daniels and Dougherty, did not do what they were bound to do in order to keep out of the schooner's way. The law requires that its commands shall be effectively obeyed. It does not tolerate a listless or tardy, imbecile obedience. And it is a cardinal canon of the admiralty law that the rules of navigation which it prescribes must be effectively, promptly, energetically, and faithfully executed. There ought not to have been a collision in this case. The two vessels were in an open sea. Even if the vessel had not her sailing lights up, (which is the question in dispute,) the tug was bound to keep out of the way, if she saw the

schooner in sufficient time to do so. The absence of sailing lights could only have misled the tug as to the direction in which the schooner was moving; and, on the hypothesis that the lookout and pilot of the tug were thus mistaken, the tug's own testimony shows that she failed to do what was necessary effectually to keep out of the way.

I take the case as it actually was,—that of a steamer and sail-vessel proceeding in such directions as to involve risk or collision. In that case the law requires the sail-vessel to keep her course, (rule 23,) and the steamer to keep out of the way of the sail-vessel, (rule 20.) It is not denied—it is proved—that the schooner complied with rule 23. She did keep her course. The steamer, on the other hand, did not keep out of the way, but, on the contrary, ran into and sank the schooner; and that in open sea, after the schooner had been seen for from one and a half to two minutes,—seen when at a distance of from 500 to 900 yards. The testimony of the tug's pilot is that he could turn his boat around in the space of 100 yards; that in this case he could have cleared the schooner in about a hundred yards; indeed, that he could have cleared the schooner in three points of the compass,—that is to say, in 3-32 of a complete circuit of 100 yards diameter. If, then, they saw the schooner one and a half to two minutes, or from 500 to 900 yards off, and yet ran into her, how can I be expected to hold otherwise than that the tug was in fault. and must be held for the damages resulting from this collision? I will so decree.