### THE MICHIGAN.

### NEALLY et al. v. THE MICHIGAN.

(Circuit Court of Appeals, Fourth Circuit. October 2, 1894.)

No. 83.

1. COLLISION BETWEEN STEAM AND SAILING VESSELS—NEGLIGENCE—EVIDENCE.
    In a libel by the owners of a schooner against a steamer for collision near Cape Henry, in a fog, at 3:35 a. m., it appeared that the schooner was on the starboard tack; that the weather was calm, and she was making but little headway; and that she was struck by the steamer at almost right angles, on the port side, a little forward of the mizzen mast, and sunk. Six of her crew testified positively that her fog horn was diligently sounded at intervals of not more than two minutes, one blast at a time, as required by law, for 20 minutes or more before collision. Her lights were all in place, and burning brightly, and she kept her course. All the seamen on the steamer testified that they did not hear the fog horn, except just before the collision, and that the steamer's fog whistle was constantly blown, and could be heard for several miles; some of them, that it was so loud as to "drown all other noises" while it was sounding. *Held*, that the schooner was not in fault.

2. SAME.
    The fact that the testimony of the schooner's lookout, given on a previous examination, about six weeks after the collision, showed that he then testified that he only blew the fog horn once before he saw the steamer coming down on the schooner, was insufficient to discredit the positive evidence of himself and the other witnesses for libelants on the trial that the fog horn was continuously sounded, where such witness gave a reasonable explanation of his former contradictory testimony.

3. SAME.
    The evidence showed that the steamer was seen by the schooner's crew 20 minutes before the collision; that the steamer's lookout did not see the schooner; that the former then plunged into a fog bank at a speed of five or six miles an hour; that on emerging from it she was making that speed, and close upon the schooner; and that the reversal of her engines failed to check her headway. *Held*, that the steamer was in fault.

4. SAME.
    It appeared that the steamer's main deck was 20 feet above the water level; that her captain's bridge was 35 or 40 feet above the water; that her lookout bridge was 8 feet above deck, nearly 30 feet above water, and set nearly 40 feet to the rear of the high-pointed stem of the vessel; and that it was impossible for a man standing on the lookout bridge to

keep a proper lookout at night, in hazy weather, for the vessels lying low on the water, which navigate the approaches to the Virginia capes. *Held*, that the steamer was in fault in not having a lookout in her bow, close up to her stem.

Appeal from the District Court of the United States for the District of Maryland.

This was a libel by B. Frank Neally and others, owners of the schooner John Holland, against the steamship Michigan, for collision. There was a judgment for libelee (63 Fed. 295), and libelants appeal. Reversed.

On the 16th June, 1893, at about 3:35 in the morning, the four-masted schooner John Holland and the British steamer Michigan were in collision, about nine miles eastward of Cape Henry, Va., in the Atlantic ocean. The Holland was 205 feet long over all, 40 feet beam, and about 18 feet deep. She was four-masted, and nearly new. At the time of collision, she was bound from Lambert's point (Norfolk) to Providence, R. I., with coal. Her main deck was out of water about 3 feet at the main hatch, and her bow about 10 feet. Her lights were hung 20 feet above the rail. She was of medium sheer. The Michigan was 370 feet long, 44 feet beam, and 29 feet depth of hold. She had four masts. She had two bridges on deck. The lookout bridge was 35 feet back from her stem, and 6 feet above the deck. The main bridge was about the center of the ship, 170 feet to the rear of the stem, and 16 feet above deck. It was about 35 feet above the water, as the steamer was then loaded; the deck itself being about 20 feet above the water. The masthead light of the steamer was 90 feet above the water, and the green light 30 feet. The Michigan was bound from Baltimore to London, England, with a full cargo, chiefly cattle. Her highest speed on a voyage is about 11½ knots an hour. Just before the collision she was running full half speed. The collision occurred by the Michigan running into the port side of the schooner, almost at right angles, striking her a little forward of the mizzen mast. The schooner sank in 40 or 45 minutes after receiving the blow. She had on a cargo of 1,702 tons of coal, and vessel and cargo were a total loss.

The weather on the morning of the collision was good. There was fog to the northward, which obscured Cape Charles light, but the light of Cape Henry does not seem to have been hidden from the schooner at any time before the collision. Fogs about the capes of Virginia are somewhat peculiar in the summer season. According to the testimony of a very intelligent pilot—J. Richard Thompson—produced by appellee, they usually rise after midnight; are hazy first, with easterly winds; afterwards becoming more or less dense, and rarely rising more than 100 feet, above which height it is clear. As a rule, they are denser towards the water surface. They do not spread generally over the water, but form in separate clouds or banks, leaving the atmosphere more or less clear in greater or less intervals between them. Such was the character of the weather and the fogs on the night in which the collision under examination happened. The schooner John Holland came to anchor off Cape Henry, 8 miles east, about 10 o'clock of the night of collision, the weather being still. By 2 o'clock a very light wind from the east sprang up, and she got under way. She was put on the starboard tack, heading northeast by north, and remained so until the collision. The wind slacked soon after she got under way, so that she quite or very nearly lost her steerage way. On first starting she made only one mile and a half an hour over the water, and for some time before the collision was making very little headway at all.

Stevens, master, testifies that about 3 o'clock Cape Henry appeared to look dim, and he told the second mate to go forward, and get the fog horn out, and give it to the man on the lookout, and, if it grew foggy, to blow it one blast at a time. He then went down to his cabin, and heard it blowing a number of times as soon as he got in the cabin, and for 15 to 20 minutes afterwards heard it blowing regularly, one blast every 1 or 1½ minutes. The

fog horn of the schooner was a mechanical one, and could be heard for two or three miles. The rule of law governing the Holland on this occasion, as to her fog horn,—she being on the starboard tack,—was this: "A sailing ship under way shall make with her fog horn at intervals of not more than two minutes, when on the starboard tack, one blast. She shall be supplied with an efficient fog horn, to be sounded by bellows or other mechanical means."

As to the blowing of the fog horn, Pommer, the wheelsman on duty, testifies that she began to blow about a quarter to 3, and continued blowing at the regular intervals until the collision, and that from the time he saw the white light of the Michigan to the collision was 20 minutes.

Kiel, the lookout of the Holland, testifies that shortly after he came on lookout the second officer gave him a fog horn, and the weather shut in a little hazy. As soon as it got hazy, which was a little before 3 o'clock, he began to blow one blast, and kept on blowing one blast. He saw the white light of the steamer about 3:05, and from the time of seeing her until the collision he was blowing the fog horn signal. Kiel had stated in a previous deposition that he blew one blast, in a manner to justify the inference that he had blown but one blast before the collision. In his testimony afterwards given he corrects this inference in the following extract taken from the record (page 46), which occurs after a recital of his earlier testimony: "That is some testimony that you gave before Mr. Rogers, in Boston. Do you wish that to be understood as the correct testimony you gave? A. No. You said I blew one blast. I blew one blast at a time. I started to blow the foghorn first once, when it was passed up to me, to try if it was in good order; and I stopped about for five minutes; and the haze came around the ship; and then I blew one blast at a time for about twenty minutes; and finally, when I saw that the steamer was going afoul of us, I sounded one continuous blast all the time to give them warning." He adds that it was about 25 minutes from the time he commenced to blow the second time until the collision.

Olsen, another witness from the Holland's crew, who was not on duty, and slept near where Kiel, the lookout, was blowing the horn, says: There was such a noise around the deck, and the big horn blowing, that he could not go to sleep. It was sounding one blast at a time, somewhere about 20 minutes before the collision. It made a loud noise. It was in the forecastle head. He finally went on deck to see what was up, hearing howling around the deck, and the fog horn blowing.

Hultman, the second officer of the schooner, says in his testimony: He got the fog horn out, and gave it to the man on the lookout, and he blew it one blast to try it. Five or 10 minutes afterwards, the lookout began to blow a second time, one blast at a time, and continued to blow for 20 to 25 minutes up to the time of collision. He could see the masthead light of the steamer all along from the time he saw her green light, at 3 o'clock, until the collision. At 3 it was clear, but began to grow foggy; and at the time of collision it was misty, not foggy. Fearing that the steamer would not see his side lights, the schooner being very long, he showed a white light in the aft rigging at 3:30, until the collision occurred. The fog horn was sounded regularly during that period.

Schmidt, one of the schooner's crew, not on duty, who was in bed about midships at the time, says: He got out once. Could not tell the time. Heard the fog horn blow. Went below again, and turned in. Heard the fog horn blow four or five times, and went off to sleep again.

Stevens, master of the Holland, testifies, among other things: After giving orders through the second officer to have the fog horn blown, went down to his cabin. Heard the blowing a number of times as soon as he got into the cabin. About 15 or 20 minutes after he went below, he heard the horn blowing very regularly. He had come on deck a while before the collision, and heard the fog signals blown two or three or four times, one blast at a time. The lookout began afterwards to blow blasts one right after another. This he forbade, and was told by the lookout that he blew the long blast because the steamer was showing her red light and coming right into the schooner.

Capt. Layland, master of the Michigan, testified, among other things, as follows: His steamer had on a full cargo, but was not quite down to her lowest mark in the water, and drew 23 feet 8 inches forward and 24 feet 6 aft. Left Baltimore about noon of the 15th June, and after midnight discharged pilot four to five miles off eastward of Cape Henry. Then gave the order to go ahead, and at 3:05 put her at full speed. Had a lookout on the forward bridge, the captain himself and the second officer being on the captain's bridge, and a man was at the wheel. There was no lookout on the deck in the stem of the ship. No sail was set. Steered E. S. E. until Cape Henry bore W., after which the course was changed to E. ¼ S., at about 3:20. The German steamer Dresden started out about the same time, bound to Bremen, and was a mile behind. Two or three minutes afterwards, noticed that Cape Henry light was obscured, and that his side lights had a little haze around them. Was going then 10 knots an hour, and he put the engines at half speed, and blew the fog whistle. Heard the German steamer's whistle astern. Heard no other fog signals. Half speed was four to five knots an hour. Shortly after slacking speed he saw a light forward quarter to half a point on his starboard bow. By the use of glasses, saw it was a red light. Gave the order full speed astern and blew whistle four times. Heard one blast of their fog horn when 30 to 50 feet off, and heard their men shouting just before the collision. The schooner sank about 40 to 45 minutes after the collision. In the interval the crew of the schooner all got aboard the steamer. During that period Capt Stevens, master of the schooner, came twice upon the captain's bridge to confer. On the last occasion, the master of the steamer says, "he came up the ladder, and said to me, 'Captain, your steamer is drifting onto the schooner,' and I told him to mind his own business and to go down." The bridge of the steamer was 170 feet from the bow, and the lookout bridge 120 to 130 feet forward of that. The steamer's fog whistle blows so loud that it was impossible to hear another fog horn sounding ahead at the same time that it was sounding.

Watkins, the mate on duty on the Michigan on that morning, testifies, among other things: He put the steamer on full speed about 5 minutes past 3, and kept her so until about 25 minutes past 3, when it came on foggy, when he put down her speed, and started the steam whistle. The fog was a low-lying fog, such as prevails in the early morning. The steamer kept ahead at half speed, blowing her steam whistle at intervals of a minute to a minute and a half. At 3:35 saw a red light on her starboard bow, 400 feet off. The master gave orders to put helm hard a-port, and reverse full speed astern. Gave four blasts in quick succession. The next thing they were into him; they had struck him. It was a minute to a minute and a half after seeing the red light of the schooner that they collided with her. Both Capt. Layland and his mate, Watkins, aver that Capt. Stevens, in answer to their question why he was not blowing his fog horn, said that it was not necessary. Both say they heard the fog horns of the Dresden before and about the time of the collision. The collision was about at right angles with the schooner. The propeller was a right-hand screw, and the tendency of putting helm to port was to throw the ship's head to starboard. If the engine had been reversed a half minute before it was, says Watkins, there would have been no collision. On other points of inquiry Watkins said: From 3 to 3:05 it was clear weather. The steamer went full speed ahead. There was no need of sounding a fog signal. The steamer sounded none. It was clear for two miles around.

Wood, lookout on the steamer, testified, among other things: Thick fog came on shortly after 3 o'clock. Twenty minutes afterwards saw a vessel a ship's length off on starboard side, in plain sail. Heard no signal or fog horn from her up to the time of collision. Was on the lookout bridge of steamer from midnight until the collision. Steamer's powerful fog horn was sounded up to time of collision, one blast every two minutes. Collision occurred at about 3:25. He reported no lights from 3 o'clock to time of collision. He saw no red light on the schooner; even on collision he saw no light. He heard a fog horn from schooner about a minute before the collision, but before hearing it she was visible, and at the same time heard voices of those on deck of the schooner. He made no reports at all to any one from 3 o'clock

to collision, as there was nothing visible to report. In that time he saw no lights of vessels at anchor or any other lights.

Capt. Supmer, master of the German steamer Dresden. testified in part as follows: After putting off his pilot outside of the Virginia capes, saw a steamer about a mile ahead of him, and followed her out to sea. She went into a fog bank, and he afterwards heard her whistle four times. When he got abreast of the steamer he saw a four-masted schooner right ahead of her, close to her. He thinks it was the duty of the schooner, at the time he saw her, to make as much noise as possible. It was calm, and she could do nothing else. The wind was so light that she could not sail much, or make much headway. She could not do anything else. The wind was so light, so she did not make any headway. Witness said that when he had passed the steamer, and when he saw the schooner, both the Dresden and the Michigan had passed through the fog bank, so that, though it was not quite clear, yet there was a little light, so that he could see the steamer and schooner. This was one of witnesses for appellee.

Oesselmann, chief officer of the Dresden, said, among other things: After testifying to having followed the Michigan into the fog bank after 3 o'clock in the morning, he says he heard the whistle blow from that steamer, and afterwards four short whistles, when the Dresden was nearly abreast of her. Then it cleared off, and he saw the steamer close together with the schooner. The preceding dense fog had lasted about 10 minutes, and the Dresden had been in it about that time, in which she moved about a mile. Mechanical fog horns can be heard, in his opinion, about a mile, and should be so heard by law. This witness says that besides the fog bank spoken of he entered another before 4 o'clock, and that between the two banks he had clear weather, during which he saw these two vessels, the steamer and the schooner, abreast of him. The distance between the two fog banks must have been a mile. The schooner must have been still in the water. She could not make headway. The weather, in the space between the two fog banks, was not quite clear. He should call it hazy weather. This witness was examined in behalf of the appellee.

Eugene P. Carver and Robert H. Smith, for appellants.

J. Wilson Leakin and Harrington Putnam, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge (after stating the facts). The rules of navigation bearing upon the case under consideration are as follows:

"In fogs, whether by day or night: A steamship under way shall make with her steam whistle, at intervals of not more than two minutes, a prolonged blast. A sailing ship under way shall make with her fog horn, at intervals of not more than two minutes, when on the starboard tack, one blast; when on the port tack, two blasts in succession. Every ship shall in a fog go at a moderate speed. In general, if two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship. Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse, if necessary. Every ship, whether a sailing ship or a steamship, overtaking any other, shall keep out of the way of the overtaken ship. Where, by the above rules, one of two ships is to keep out of the way, the other shall keep her course."

From the preceding statement of the material portions of the evidence given in this case, and from the foregoing rules of navigation, it is clear that the principal question to be solved by this court is whether the men in charge of the schooner Holland at the time she was run into and sunk by the steamer Michigan exercised a due diligence in blowing the schooner's fog horn before the collision

happened. Although there was no fog when the collision did occur, and it was not actually incumbent upon the schooner to blow her horn just at that time, yet the question will be considered on the hypothesis that the schooner was herself, at the time of collision, enveloped in a fog bank. If she was, then it was certainly her duty to sound her fog horn diligently, at intervals of not more than two minutes, one blast at a time, during the period that the fog was upon her. The testimony of all members of her crew who could have any knowledge on the subject is full, positive, consistent, and emphatic in the affirmative of that question. The court is bound to credit the testimony of unimpeached witnessess as respectable and intelligent as those of the schooner appear to be. The case of the Michigan depends on breaking this testimony down. This has been attempted by two means: First, the seamen who were on board the steamer all depose that they did not hear the fog horn of the schooner except just before the moment of collision; and they all aver at the same time that the steamer's fog whistle was constantly blown, and was so exceptionally loud in tone that it could be heard for a distance of several miles. Some of them say that this whistle was so loud and shrill as to "drown all other" noises while it was sounding. We have little doubt that within the range of the sound of such a whistle those on board the steamer failed to hear any sounds from the schooner. The fog horn of the schooner, which was diligently blown, must have been drowned by the steamer's own overpowering whistle. It may be said generally, however, of negative evidence of this sort, that very little weight is ever given to it when contradicted by positive proof from credible witnesses in position to know the facts. Not to hear a sound, not to see an object, does not disprove its existence.

We come, therefore, to the other means by which the appellee assails the testimony given by the schooner's crew. As said before, all her witnesses, six in number, testify positively that her fog horn was diligently blown for as much as 20 minutes before the collision. A preliminary examination of three of these witnesses —Kiel, the lookout; Hultman, the deck officer; and Pommer, the helmsman—had been taken in the city of Boston six weeks after the collision. In these depositions Hultman and Pommer testi fied substantially as they did six months afterwards in court in Baltimore. But on the part of the appellee it is maintained that the first testimony of Kiel, taken in Boston, not only contradicts that given by himself afterwards in court, but discredits that given by other witnesses of the schooner on the point on which Kiel is alleged to contradict himself; that is to say, on the blowing of the schooner's fog horn. This would be laying down very hard lines for the libelants in the case at bar. All their witnesses, if credited, prove a proper diligence in respect to the fog horn. Their character and credibility are not impeached. They must be esteemed to be as worthy of credit as any other witnesses examined in the cause. They seemed to be exceptionally intelligent. But yet it is contended by counsel for appellee that their testimony must be discredited because one of their number, whose testimony in court

accorded with their own, had given different testimony in a previous examination. The mere statement of such a contention shows it to be of questionable soundness. But, be this as it may, it is denied on the part of the appellants that there is any material discrepancy between Kiel's testimony given in Boston and that which he afterwards gave in court. The deposition of this witness taken in Boston was in substance as follows, his own language being given as far as practicable. He had said that the weather had become hazy about 3 o'clock:

"I began blowing just when a little haze set in, and the haze just lasted for about two minutes, and everything cleared away again; it was clear weather."

He added that he did not keep on blowing the fog horn after that. After he saw the light of the steamer, he continues:

"I immediately started to blow the fog-horn, which I had still on the forecastle head, and made a noise,—an alarm. Gave him a warning that he was going foul of us that way. It seems he didn't pay any attention to it."

Kiel went on to say that he had no conversation at Norfolk with any one in which he said that, because the weather was clear for half an hour before the collision, he did not sound his fog horn. He said further:

"It wasn't quite foggy. I shouldn't think it was necessary to blow the fog horn, but we saw several vessels laying round us, and to anchor. I saw one three-masted schooner ahead of us, and, in case the fog should keep on, I had it handy. It was given up. to me to have it handy. Int. You sounded one blast, then, on the fog horn? · A. Yes, sir; I sounded one blast. Int. Then it cleared off? A. Then it cleared off. Int. You didn't sound it again? A. No, sir. Int. The next time you sounded it you saw that the Michigan was coming down on you? A. Yes, sir. Int. And then the collision occurred a very few minutes after that? A. Yes, sir."

In his testimony given afterwards in court at Baltimore he says, on being asked what he meant by "one blast," as above:

"When the second mate gave me the fog horn, I tried it to see if it was in good order, and it was clear then, and I let it stand for about five minutes, and the haze came on, and I commenced blowing one blast.  *   *   *  When you are on the starboard tack, you are supposed to blow one blast at intervals, and so I did. Q. How many times do you think it was from the time you commenced blowing the second time until the collision; how long do you think it was? A. About twenty-five minutes. Q. How many times do you think you blew that horn in that interval? A. About twenty times."

A candid examination of Kiel's testimony shows that it is in substantial accord with that of the other ·witnesses who testified in behalf of the schooner. We think it is obvious from the testimony of the schooner's crew that they believed for some time after the cause of action in this case arose that the real question which would be tried would be as to whether the schooner's lights were up and were burning brightly at the time of the collision. They seem to have had no thought that the case would turn upon the question of her fog horn being blown. Entertaining this idea, it could hardly have entered their heads to meet and concert together what their evidence in regard to the fog horn should be. It is certain that they had not conspired together on this subject when the testimony of three of them was taken in Boston in July, shortly after the col-

lision. Yet two of the witnesses, Hultman and Pommer, testified there that the fog horn was blown all the time from when the steamer was first seen, which was about 20 or 25 minutes before the collision, up to the moment of the accident. The idea that the real question at issue was in regard to the lights of his vessel evidently possessed Kiel when he was under examination at Boston. Feeling that the matter of the fog horn was a merely incidental question, he seemed to testify thoughtlessly and confusedly on that subject, and to be lacking in precision of statement. He was liable, therefore, to be easily misled by the leading questions put to him by the astute counsel of the appellee on the subject of the fog horn. This impression of the schooner's crew that the case would be tried upon the condition of her lights grew out of the fact—which seems to be established by the evidence—that there was no real fog where the schooner was before and at the time of collision, but only a haze. The testimony of the steamer's own witnesses establishes that fact. The testimony of Supmer, master, and of Oesselmann, deck officer, of the Dresden, is clear and positive on that point. Oesselmann proves that the schooner was in a hazy space between two heavy fog banks, and that the Michigan had passed through one of these fog banks into a comparatively clear space when she encountered the Holland. We think the consistent and persistent testimony of all the crew of the schooner who were examined, to the effect that there was no fog where the schooner was, but only a haze, was true, and that this thoroughly established fact is of special significance and importance in this case. Every witness examined on the part of the schooner testifies that her fog horn was persistently blown throughout the period required by law, in the manner required by law. She must, therefore, be regarded by the court as without fault in that particular. Her lights were all in place, and burning brightly. She kept her course on the approach of the steamer. We think, therefore, that she was without fault in the affair.

The case of the Michigan was different. Although 20 minutes before the collision she was seen by two or more of the crew of the schooner, yet her own lookout did not see the schooner. She then plunged into a fog bank at a speed of five to six miles an hour. On emerging from it she was close upon the schooner, making that speed. Five to six miles an hour is too great a speed to move with in a fog over waters always as full of vessels of every kind as the waters at the entrance of the Virginia capes into Chesapeake bay, Hampton Roads, and James and Elizabeth rivers. The cause of this accident was the fact that the reversal of the Michigan's engines failed to check the headway of the steamer, and to prevent her from plunging into the side of the schooner. Five to six miles an hour is a questionable speed in a fog everywhere. The event here demonstrates that it was a reprehensible speed in the waters off Cape Henry, and it was gross fault on the part of this steamer. This speed was the cause of this collision.

The steamer was also guilty of a very grave incidental fault, but for which the accident would not have occurred. A very large

portion of the carrying trade of our eastern seaboard is done by the modern three and four masted schooners. They have great capacity for freight in the hull, and lie low upon the water. Their decks are not more than 5 to 8 feet above the surface. Vessels of this class traverse all the waters of our Atlantic seaboard, night and day. The Michigan was a vessel of different build. Her main deck was 20 feet above the water level. Her captain's bridge was 35 to 40 feet above the water. Her lookout bridge was 8 feet above deck, and nearly 30 feet above the water. This latter bridge was set nearly 40 feet to the rear of the high-pointed stem of the vessel. It was impossible for a man standing 40 feet back of the stem, on this lookout bridge, to keep a proper lookout, especially in hazy weather, at night, for the large class of vessels lying low on the water, which navigate the approaches to the Virginia capes. It was a flagrant fault in the Michigan that on the occasion of this collision she had no lookout in her bow, close up to her stem, in position to look over the point of the vessel on each side, and to discover in good time vessels that might be ahead of her in her course. The lookout of the Michigan seems from his own evidence to have been of no service on the occasion. He says that he reported no light from 3 o'clock to the time of the collision. He saw no red light on the schooner. Even at the collision he saw no light. It seems that the lookout of the steamer could see nothing, and the rest of the crew could hear nothing, which could have been of use in avoiding the accident. Masters of ships are not at liberty to adhere to machine rules in matters as important as the duties of lookouts. On the broad ocean, under clear skies, it may be sufficient for a lookout to be 30 to 40 feet back of the stem of a ship, and 30 feet in the air from the water; but in fogs, and in emergent crises, when it is necessary to be alert, and to meet every unusual exigency, it is the duty of a lookout to be at the place' on the ship where he can best see what is in her path, and to be in the best position to discover and report all that is to be seen and all that should be reported. On the occasion under consideration the lookout was not where he could see the vessel ahead of him, and, mainly on that account, was inefficient, useless, and neglectful. The Michigan was in fault in not having had a competent lookout in her bow, close to her stem, diligent in duty, alert to see what was before him, and prompt in reporting in time the position of the Holland.

We are of the opinion that the court below erred in the particulars set forth in the appellants' assignment of errors; that its decree must be reversed; that the Michigan was in fault as to her speed and her lookout; and that a decree should go against her for the damages sustained by the owner of the schooner from the collision.