## THE DORCHESTER.

### (District Court, E. D. Virginia. July 3, 1908.)

**1. COLLISION—LOOKOUT—DUTY OF STEAM VESSEL.**

The duty of a steamship to see that her lookout maintains constant observation and the utmost diligence is especially imperative in favor of a sailing vessel, which under the rules has the right of way.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 140, 141.]

**2. SAME—SUIT FOR DAMAGES—EVIDENCE.**

The testimony of two witnesses introduced by a steamship which sank a small schooner in a collision in the night, one of whom was an employé of the owners, that they found and examined what was supposed to be a part of the wreck, and from such examination judged that the schooner's lights were not properly set, *held* of little weight as against the positive testimony of the owners and navigators of the schooner to the contrary, where the claimed examination was wholly ex parte, and no notice of the finding or the inspection was given to the other parties in interest.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 272.]

**3. SAME—STEAM AND SAILING VESSELS—FAILURE TO KEEP PROPER LOOKOUT AT NIGHT.**

A collision occurred a short distance within the mouth of the Elizabeth river on a clear and calm night between a steamship coming out from Norfolk and a small schooner passing in; the schooner being sunk and her cargo lost. The schooner was sailing with all sails set in a light wind and kept her course and speed. She carried proper lights, which were seen by passengers on the steamship when nearly a mile away, but were not seen by the master or lookout until too close to avoid the collision. *Held,* that the steamship was solely in fault in failing to maintain a proper lookout.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 140, 141.]

In Admiralty. Suit for collision. On libel, cross-libel, and petition for personal injuries.

This libel, cross-libel, and petition grew out of a collision between the Dorchester and the schooner Fannie S. Groverman, which occurred in the waters of and near the mouth of Elizabeth river, on the early morning of the 13th of September, 1907. The facts are briefly these: The schooner, a "sharp sailed two-masted bugeye," about 60 feet in length, gross tonnage 13 tons, net 7 tons, and the Dorchester, an ocean-going steamship 282 feet long, came into collision about 10 minutes past 12 on the morning of the 13th of September, 1907, a short distance above Deepwater Pier of the Jamestown Exposition. The bugeye, owned by the libelant and one of his brothers, was en route to

Norfolk loaded with watermelons, manned by the two Robins and a younger brother, Ross Robins, and had on board the petitioner, John B. Lawson, the owner, whose watermelons were being carried for hire from his home in Gloucester county, Va. The Dorchester was one of the line steamers of the Merchants' & Miners' Transportation Company bound from Norfolk to Providence, R. I.

Each of the vessels contend that the collision was solely the fault of the other, and that they in all respects complied with the rules of navigation governing them, and were properly and efficiently manned and equipped before and at the time of the collision, having competent lookouts and proper lights properly set and burning brightly. The bugeye says: That she was proceeding under full sail from near Deepwater Pier on a port tack, bound up the river with a gentle wind from the south, in smooth water, the night starlight and good for seeing lights; that, when some two miles off, the lookout sighted the steamship, first observing her red light, and then both lights for a while; that the bugeye continued all the while on the port tack, keeping her course and speed, and, when about a quarter of a mile from the Dorchester, the latter put her searchlight on her, and in a few minutes the collision occurred, the steamer striking the bugeye about amidships, cutting her in two, and causing a total loss of the vessel and cargo, and greatly endangering the lives of her passenger and crew. The Dorchester, on the other hand, says: That while proceeding down Elizabeth river, about a mile below Boush Bluff Lightship, her lookout saw and reported a very faint green light about a point on the starboard bow; that the master of the Dorchester looked, but could see no light, and, upon examining with his glass, observed about a point or a point and a quarter on the starboard bow a faint outline of sails, but could not make out the direction in which the vessel was heading, though he presumed she was running in a southerly and westerly direction, and instantly gave the signal to stop the engines, ordered his wheel hard astarboard, threw on the searchlight, and observed the schooner heading at about right angles across the bow of the ship, still about a point on the starboard bow; that he then ordered his wheel full speed astern, and blew danger signals; that, when he first saw the schooner, she was 600 or 800 feet away, and some 400 feet when he blew the danger signals; that the time which elapsed between the order to stop and back was about 10 seconds, and at the time of the collision the engines had stopped, but the ship was still making some headway.

W. W. Old & Son and James F. Duncan, for libelant and petitioner.
Hughes & Little, for respondent.

WADDILL, District Judge (after stating the facts as above). This collision being between a steamship and a sailing vessel, the rules of navigation applicable are embraced in articles 21, 22, and 23 of the Inland Rules. Act June 7, 1897, c. 4, 30 Stat. 101 (U. S. Comp. St. 1901, p. 2883). These rules briefly prescribe: That, where steam vessels and sailing vessels are approaching in such direction as to involve risk of collision, the former shall keep out of the way of the latter; that the sailing vessel in such case shall keep her course and speed; and that the steam vessel shall, if the circumstances of the case admit, avoid crossing ahead of the sailing vessel, and such steam vessel shall, on approaching the sailing vessel, if necessary, slacken her speed, or stop, or reverse. The requirements of these rules are positive. They must at all times be strictly adhered to, and those failing to observe them do so at their peril, unless excused by the provisions of articles 27 and 29, known as the "Prudential and Special Circumstances Rules" (Act June 7, 1897, c. 4, 30 Stat. 102 [U. S. Comp. St. 1901, p. 2884]), which latter articles, upon the evidence in this case as viewed by the court, afford no excuse for this collision. Steamship

Co. v. Low, 112 Fed. 161, 166, 171, 50 C. C. A. 473; The Richmond (D. C.) 114 Fed. 208, and cases cited; The Elizabeth (D. C.) 114 Fed. 757.

There was no apparent reason for this collision, and the same could not well have occurred without the negligence of one or other of the navigators of the vessels. There was ample sea room, a deep-water channel at the point of collision of at least 1,000 feet wide. The weather was good, the wind light, the sea calm, a good night for seeing lights, and everything was propitious for safe navigation. Under such circumstances, if the lights of the schooner were properly set and burning, and she maintained her course and speed, it was the duty of those in charge of the Dorchester to have seen her in ample time to have avoided and made the collision impossible. Hence the crucial point for determination is: Whose fault and what brought about this collision?

The evidence presents a sharp conflict, which is not unusual in this class of cases; but the court, because of the testimony of the large number of intelligent and disinterested witnesses, passengers upon the steamship, is less embarrassed in reaching what appears to be a correct conclusion than frequently occurs. That the lights upon the bugeye were properly set and burning at the time of and preceding the collision is conclusively established. The navigators of the bugeye, and the passenger on board, testified fully on this subject, and the former that the lights were of the kind in general use on vessels of this class. As many as four passengers on the Dorchester testified that they saw and observed the lights on the schooner. Three of them prior to the placing of the searchlight upon the vessel, which occurred when they were about a quarter of a mile apart, and two of them when the vessels were from a mile to three quarters of a mile apart, observed the schooner's red light brightly burning. These witnesses give full accounts of the circumstances of the collision and of seeing the lights at the time they testify to; that the schooner did not change her course, and several did not observe the slowing down of the steamer until after the collision, and some say that about that time she slightly went to port. These witnesses from the steamship were largely made up of the members of the Rhode Island State Commission at the Jamestown Exposition returning home, men of prominence, the Speaker of the House of Representatives, members of the Legislature, and other prominent citizens, and the court has no difficulty in ascertaining, upon full consideration of their evidence, and that of the witnesses on the bugeye, and from the steamship, that this collision was attributable to the fault of the navigators of the steamship, in failing sooner to see and observe the presence of the bugeye, which could readily have been done had the lookout upon this ship properly performed his duty. Indeed, there was no excuse for his claim that he did not see this little vessel until within a quarter of a mile of it, when others not charged with the duty of observation saw it three times as far away. On such a night, the vessel could and should have been seen, and that it was not can only be attributed to the failure to keep an efficient lookout, which, doubtless, arose from

the fact that immediately before the accident there had been a change of lookouts, and the one who had just taken charge had not concentrated his mind on his duty. The law imposes upon the lookout the exercise of unremitting vigilance. His position is one of great responsibility, requiring constant observation and the utmost diligence, having regard not only to the safety of his own vessel, but of others who lawfully navigate the sea, and this duty is especially imperative in favor of vessels having the right of way; the steamship being charged not only with avoidance of a collision, but the risk of collision. The Manhasset (D. C.) 34 Fed. 408; The Michigan, 63 Fed. 280, 288, 11' C. C. A. 187; The Vedamore, 137 Fed. 844, 70 C. C. A. 342.

The respondent seeks to throw the fault on the bugeye because of a defect in the arrangement of the lights, and in support thereof attempted to show that an examination of what purported to be the wreck of the forward part of the bugeye proved that the same were improperly set, in that her lights did not have inboard screens projecting at least three feet forward from the lights, so as to prevent them from being seen across the bow. Article 2, subsec. "d," and article 5, of Inland Rules, supra. Two witnesses were introduced by the respondent, one of them an employé of the steamship company, who claimed to have examined what purported to be the bow of the bugeye, and testified that they judged from the portion of the wreck produced that the lights were not properly set. The court has not been impressed with this evidence, which was ex parte so far as the alleged examination of this wreck is concerned. It may or may not have been the wreck of the bugeye in collision. The fact that the name of the sunken vessel was upon it is not at all conclusive, especially as the so-called inspection was not made in the presence of other parties in interest, who did not know that any part of the wreck had been recovered, and, if it was the purpose to use the same as evidence against the libelant, at least notice of the inspection should have been given, to the end that the danger of fabrication of evidence would be removed. It would seem to be but a reasonable requirement to impose upon persons seeking to get the benefit of this class of testimony the obligation of giving notice to others to be affected thereby, and it is only what those so introducing the same should be more than anxious to do. The R. R. Kirkland (D. C.) 48 Fed. 760; The Richmond (D. C.) 114 Fed. 211. This testimony, thus introduced, falls far short of establishing the defect in the manner of setting the lights, particularly in view of the evidence of the owner and crew of the bugeye that the same were properly set. The fact that the ship's navigators and lookout may not have seen the same or did not make their observation earlier, does not disprove the existence of the lights. In The Richmond (D. C.) 114 Fed. 211, it is said:

"The positive testimony of those on the schooner, in a position to see the lights, and know of their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either fail to observe or happen not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe the light cannot be said to disprove its existence"—citing Stitt v. Huidekoper, 17 Wall. 384, 21

L. Ed. 644; The Thingvalla, 48 Fed. 764, 1 C. C. A. 87; The Michigan, 63 Fed. 280, 11 C. C. A. 187; The Alice B. Phillips, 81 Fed. 415, 26 C. C. A. 467; Green v. Compagnia Generale, 102 Fed. 650, 42 C. C. A. 580.

The conclusion reached by the court, upon the whole case, is that the collision was the result of the negligence of the Dorchester, and that the bugeye, her crew and her passenger, the petitioner herein, were free from fault, and not in any way responsible therefor.

This brings us to the question of the amount of damages which should be allowed to the parties respectively. The libelant's loss, as testified to by him, is as follows: Schooner, $900; freight money, $15; clothes, $60; watch, $10; cash, $25. The court thinks that a proper award to him on his own account, and those in whose behalf he sues, would be $940, which allows $800 for the schooner. The undisputed evidence was that the petitioner's cargo of watermelons were worth $300. For this sum he should be paid, leaving for consideration the more important question of the allowance for the personal injury sustained by him, which is more difficult than usual, owing to the character of the injuries. Libelant was a man 58 years of age with a family, of good health, owning a farm on which he made a living for himself and those dependent upon him, and apparently a good one. The injury he sustained was to his throat, which experts testified had become very serious. He had almost entirely lost his voice, and continued to grow worse from the time of the injury until the time of the trial, and the testimony was that the affection was permanent and dangerous in its character, especially that, aside from the loss of his voice, it tended greatly to weaken the petitioner physically, with a possibility of strangulation. It is believed that the sum of $4,000 is a reasonable award. The petitioner first filed his claim for $6,000; but, at the time of the hearing, he asked leave, by reason of having grown worse, to amend the same so as to claim for his injury $9,000. The conclusion reached upon the amount makes it unnecessary to pass upon the right to amend, which was contested by the respondent.

A decree may, accordingly, be entered in behalf of the petitioner, Lawson, for this sum, as well as for the item of $300 aforesaid, and the sum of $940 to the libelant.