THE NOREUGA.

THE GLENLUI.

(District Court, E. D. Virginia. January 20, 1914.)

1. COLLISION (§ 49*)—PRECAUTIONS—LIGHTS.
    In a libel for collision, evidence *held* to require a finding that the lights of the sailing vessel with which the steamship collided were properly set and burning at the time of the collision.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 55; Dec. Dig. § 49.*]

2. COLLISION (§ 43*)—STEAMSHIP AND SAILING VESSEL—DUTY TO GIVE WAY.
    Where a steamship and sailing vessel are approaching each other on converging courses, it is the duty of the steamship to give way and the sailing vessel to hold her course, and the steamship, having attempted to cross the bow of the sailing vessel, resulting in collision when there was ample sea room, was at fault, rendering her liable for the damages sustained.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 43–47; Dec. Dig. § 43.*]

3. COLLISION (§ 45*)—NAVIGATION—ACTS IN EXTREMIS.
    Where a steamer was approaching a sailing vessel on converging courses, and the navigator of the steamship, on a collision appearing imminent, starboarded the helm, throwing the steamship across the bow of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the sailing vessel, and did not stop or reverse the engines until it was too late to prevent a collision, such maneuver could only be excused as an error in extremis and was unavailable where the steamship's officers were negligent in failing to observe the sailing vessel earlier and so to navigate the steamship as to avoid a collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. § 45.*]

4. SALVAGE (§ 21*)—RIGHT TO SALVAGE—CAUSE OF DISASTER.

Where the negligent operation of a steamship was the cause of a collision resulting in injury to a sailing vessel and a cargo, neither the steamship nor her owners could recover for salvage services rendered in saving the same.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 48–51; Dec. Dig. § 21.*]

In Admiralty. Libels in admiralty by Willig & Ebert and others, as owners and in behalf of others having an interest in the cargo of the Norwegian ship Glenlui, against the Norwegian steamship Noreuga, and by the Actreselskabet Norge Mexico Gulf Linjen, a Norway corporation owning such steamship, on behalf of the officers and crew thereof, against the Glenlui and her cargo. Decree for libelant in first suit; other libel dismissed.

Lewis, Adler & Laws, of Philadelphia, Pa., and John W. Oast, Jr., of Norfolk, Va. (Frances L. Laws, of Philadelphia, Pa., of counsel), for the Glenlui and her owners.

Floyd Hughes, of Norfolk, Va., for the Noreuga and her owner.

WADDILL, District Judge. On the morning of November 1, 1912, about 4:45 o'clock, at a point some 90 miles south of Cape Hatteras, on the Atlantic Ocean, a collision occurred between the Norwegian sailing ship Glenlui and the Norwegian steamship Noreuga.

The Glenlui was a large and powerful vessel, built of iron, 1,806 tons net register, 265'1" long, 42'1" beam, depth of hold 23'9"; and the Noreuga was a large and valuable steel vessel of 2,689 tons register, 333'9" long, 46'11" beam, and depth 23'. At the time of the collision, the Glenlui was laden with a cargo of 1,219,033 feet of pitch pine lumber under deck, and 62,291 on deck, bound on a voyage from Pensacola, Fla., for Montevideo, South America; and the Noreuga was laden with a general cargo of merchandise, en route from the port of Norfolk, Va., to the port of New Orleans, La. On the morning in question, while the Glenlui was proceeding close hauled on the starboard tack, the Norcuga collided with and struck the Glenlui in the forward part on the port side, tearing away her bow, foremast, fore-rigging, and doing other serious damage; the steamer also receiving serious damage by having a large hole made in her starboard side. The wind at the time was fresh from the southeastward, the night clear, but dark, good weather, and each vessel making about ten knots an hour. The Noreuga stood by the Glenlui and transferred the latter's crew to the Noreuga, and on the next day towed the Glenlui some 130 miles en route to the Capes of Virginia, when a gale was encountered, and the Noreuga's hawser parted.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

The United States Battleship Minnesota thereupon went to the Glen-lui's assistance and towed her further on her way to the Capes, until she was met by the Merritt & Chapman Wrecking Company's tugs Rescue and Merritt, and taken by them to Newport News, Va. At Newport News, the Glenlui discharged her cargo of lumber and was subsequently sold in her damaged condition.

The libel in the first case was filed on behalf of the owners of the cargo of lumber to recover the loss sustained by reason of the collision, and in the last case by the owners of the Noreuga to recover for alleged salvage services, rendered in connection with the rescue of the Glenlui and her crew, and towing the vessel as aforesaid for the Capes of Virginia. The two cases were by stipulation heard together, and will be disposed of in the order mentioned.

First. The libel in the first suit, while filed solely on behalf of the owners of the cargo of lumber on the Glenlui, and not for damage to that ship, nevertheless involves the collision between the Glenlui and the Noreuga, and presents the usual questions arising in collision cases, and is determinable by the law and rules of navigation properly applicable thereto. The libelants, the cargo owners, charge that the collision resulted from the negligence, carelessness, mismanagement, and inattention of those navigating the Noreuga in (a) not having a lookout properly stationed; (b) in not taking precautions to avoid the sailing vessel; (c) in not keeping out of the way of the sailing vessel; (d) in endeavoring to cross the bow of the sailing vessel; (e) in being so negligently and carelessly manned and maneuvered as to bring about the collision; and (f) in failing to have proper lights set and brightly burning.

The Noreuga denies generally the allegations of fault made by the libelant, and insists that the collision was brought about by reason of the failure of the Glenlui to have in command a competent master and crew, a vigilant lookout on her forecastle, and particularly that the Glenlui's lights were defective in that they were not set and burning as required by law so as to be visible a distance of two miles in the situation in which the two vessels were approaching each other prior to the collision, and that the collision was thus brought about by reason of the insufficiency of the lights as aforesaid.

Considerable testimony was taken, and in the view taken by the court, while there is much evidence to sustain the contention of the libelant, the owners of the cargo on the Glenlui, that the Noreuga was not manned and controlled at the time of the accident by competent navigators, particularly as respects her lookout and wheelsman, the former being a young man 17½ years of age, rated as a "boy about the deck," and the latter a common seaman, only 21 years of age, still the case really turns upon whether or not the Glenlui, at the time of the collision, was equipped with proper lights duly set and burning, and whether the Noreuga was being so navigated as to keep out of the way of and avoid collision with the sailing vessel, and also whether she was not in fault for attempting to cross the bow of the Glenlui.

[1] The court is convinced, upon a careful consideration of the testimony, that the Glenlui was equipped with regular lights, properly set

and burning at the time of the collision. Witnesses on behalf of the Glenlui, consisting of her master, mate, lookout, wheelsman, steward, and two watchmen, clearly established the fact that her lights then in use were usual and proper ones, and were burning brightly before and at the time of the accident; that they were regularly lighted and placed, examined from time to time, and observed immediately before and shortly after the impact, and were still burning brightly after the collision and the injury to the light box; and that the port light was seen and observed by the crew while they were being taken off the vessel and en route to the Noreuga, a distance of as much as a mile away, and after daylight of the same morning, upon returning to the Glenlui as late as 10 or 11 o'clock, the lights were still brightly burning. These witnesses from the ship were examined by the libelants; and the second mate of the Glenlui, whose watch ended at 4 o'clock in the morning, was called by the Noreuga as a witness, and, while he makes some criticism of the port light on his vessel, he admits that the same was of proper size, was put up as usual, and when he turned in that it was all right and properly set and burning. This positive testimony of the officers and crew of the ship ought not to be lightly disregarded, especially when assailed only by persons of doubtful competency, themselves apparently negligent, merely because they claim not to have seen the light. On the contrary, their testimony should be viewed favorably, as it is improbable that seamen would themselves consent to the navigation of a ship upon the high seas without lights. The Richmond (D. C.) 114 Fed. 208, 212; The Dorchester (D. C.) 163 Fed. 779, 782. Nor can the court lose sight of the fact of the Noreuga's failure to mention in her log book so important an event as that of the defective lights of the Glenlui, now made the real basis of its explanation of the collision. The Richmond (D. C.) supra, 114 Fed. 208, and cases cited; The Winooski (D. C.) 162 Fed. 64. Against this positive testimony as to the existence of the light, we have the evidence of those navigating the Noreuga that they failed, as aforesaid, to observe the same until the vessels were only a short distance apart, and too late to avoid collision, and also that of Commander Harold Lundh, director of the Nautical College of Christiania, and of the Public Control Office for Ships Instruments of Norway, a most accomplished representative of his government, and a high authority on the subject under consideration, who testified as to having examined a tower and lamp purporting to have been taken from the Glenlui, and forwarded to Norway at the instance of the ship's representative; that he insisted and endeavored to demonstrate that the light was not the regulation light and could not, on account of its condition and that of the tower, as he described it, have been seen and observed the prescribed distance. .Assuming that the tower and lamp forwarded to Norway and examined by the expert were those of the Glenlui, and when inspected by him were in the same condition as on the night of the occurrence, still it is hard for the court to adopt expert opinion, procured without notice to adverse parties, long after the accident, and thousands of miles away, in place of the evidence of witnesses who were present at the scene of the collision. However

intelligent and conscientious such a witness may be, the testimony is but an effort generally to substitute theory for fact, and can rarely be depended on, as it is impossible, as in this case, to prevent uncertain and unreliable conclusions being reached in connection with the same, arising from the difficulty of having the subject under investigation placed in the precise relation to the occurrences as they existed at the time of the happening of the accident. The tower and lamp examined by Commander Lundh may or may not have been the actual ones on the vessel at the time of the collision, and more difficult still is it to determine as to their condition on the two occasions. Respecting this matter, it must be admitted that the element of uncertainty enters, and it is impossible for the court to decide, with that degree of definiteness and certainty that ought to prevail in the ascertainment of a given fact, either that they were the same or in like condition at the different times.

[2] Assuming the existence of proper lights on the Glenlui, the responsibility for the accident is easy of determination. She was a sailing vessel, required to keep her course and speed; and upon the steamship was imposed the burden of avoiding collision, or the risk thereof with her, and not to cross her bow; and for a collision occurring between a sailing vessel and steamship under the conditions existing here, with ample sea room, all the presumptions are favorable to the sailing vessel. The New York, 175 U. S. 187, 204, 20 Sup. Ct. 67, 44 L. Ed. 126; The Pavonia (C. C.) 26 Fed. 106; The Richmond (D. C.) supra, 114 Fed. 208, 212; The Delmar (D. C.) 125 Fed. 130; The Job H. Jackson (D. C.) 144 Fed. 896. Members of the crew of the sailing vessel testified to having seen the steamship several miles away; that the Glenlui did not change her course and speed, nor did the steamship in time to avoid the collision; that, upon the steamship approaching the Glenlui so close, they sounded the fog signal, and rang a bell to attract the Noreuga's attention, and finally, seeing the accident was inevitable, put her wheel hard aport, with a view of lightening the lick of the collision as far as possible; and that the steamship heedlessly ran upon them, and, when only some two ship's lengths away, changed her course by starboarding and going to port across her bow, when too late to avoid the collision.

The Glenlui cannot be said to have been guilty of fault in what she did, whereas the Noreuga was clearly so in her failure sooner to observe the Glenlui and to so navigate as to avoid collision with her. It is apparent from this testimony that the Glenlui's lights could have been seen by those navigating the Noreuga, had they been discharging their duty, in ample time to have avoided the collision, or the risk thereof, and that the actual collision could and would have been avoided. Moreover, had they been in the exercise of due care, there was no reason why a sailing vessel the size of the Glenlui, with her sails set, and giving the signals that she gave, should not have been seen, observed, or heard in time to have avoided running into her; and it is likewise quite clear that had those in charge of the Noreuga properly directed her navigation upon observing the Glenlui, namely, by reversing her engines and putting her wheel hard aport, with a view

of passing under the stern instead of across the bow of the Glenlui, there would have been no collision.

[3] Instead of making this maneuver, the young man in charge of her navigation, the second mate, upon observing the presence of the Glenlui, took the directly opposite course and starboarded, throwing his steamship across the Glenlui's bow, and not until after the steamer's master, who had retired, was called on deck were the engines either slackened, stopped or reversed, and put astern. This maneuver in navigation can only be excused, if at all, as an error in extremis, which the court thinks should not avail here, and in any event that the Noreuga is clearly liable by reason of her negligence in failing to see and observe the Glenlui earlier, and so navigating as to avoid collision, or the risk thereof, with her.

[4] Second. Considering the second libel, brought by the owners of the Noreuga against the Glenlui and her cargo, to recover damages for salvage services in connection with saving the latter ship and cargo, the same having been rendered in an effort to save them because of injuries in a collision brought about by the negligence of the Norcuga, no recovery can be had therefor.

It follows from what has been said that the libelant in the first suit is entitled to recover against the Noreuga, and that the libel in the latter case should be dismissed, and a decree will be so entered on presentation.