PACIFIC–ATLANTIC S. S. CO. (E. J. LA-
VINO & CO. et al., Interveners) v.
UNITED STATES.

THE OREGON.

No. 6745.

United States District Court
E. D. Virginia, at Norfolk.

Aug. 12, 1948.

Kirlin, Campbell, Hickox & Keating, of New York City, and Baird, White & Lanning, of Norfolk, Va., for Pacific-Atlantic S. S. Co.

Bigham, Englar, Jones & Houston, of New York City, and Vandeventer & Black, of Norfolk, Va., for E. J. Lavino & Co., Inc.

Dow & Symmers, of New York City, and Hughes, Little & Seawell, of Norfolk, Va., for Reconstruction Finance Corp.

George R. Humrickhouse, U. S. Atty., of Richmond, Va., Alfred T. Cluff, Sp. Asst. to Atty. Gen., for the United States.

PAUL, District Judge.

This action involves a collision between the New Mexico, a battleship of the United States Navy, and the Oregon, a merchant vessel owned by the Pacific-Atlantic Steamship Company. The collision occurred about 4:42 or 4:43 in the morning of December 10, 1941, at a point in the Atlantic Ocean about forty miles approximately due south of Nantucket Shoals Lightship.

The New Mexico, a 1918-class battleship, approximately 600 feet long on the water line, with a beam of 100 feet, and a displacement of about 35,000 tons, was proceeding from Casco Bay (Portland), Maine, to Norfolk, Virginia, and was accompanied by three destroyers, the U.S.S. Hughes, the U.S.S. Sims, and the U.S.S. Russell. These naval vessels were proceeding in a formation in which the destroyers formed an anti-submarine screen for the protection of the New Mexico. Due to the existence of war conditions brought on by the Japanese attack on Pearl Harbor a few days before (December 7), the navy vessels were running without lights. They were on a base course of 236 degrees true (approximately southwest by west), but were "zigzagging" in accordance with a prescribed plan. At the time of the collision they were on a leg of the zigzag and following a course of 216 degrees true at a speed of 14 knots.

The Oregon was a single screw merchant vessel with an over-all length of 417 feet, a beam of 60 feet, and a displacement of 12,875 tons. She was a new ship, having been completed during the summer of 1941, and at time of the collision was bound from Africa to Boston with a cargo of 6,400 tons of manganese ore and 14,000 bales of wool. Pursuant to instructions received at sea by radio a few days previously, she also was proceeding without lights and was heading for Nantucket Shoals Lightship by radio bearings. The Oregon was on a course of 340 degrees true (approximately north-northwest) and was moving at a speed of slightly over 13½ knots.

The courses and speeds of the vessels are as testified to by their respective officers as those maintained until a brief period of time before the collision when both vessels altered their courses in an attempt to avoid collision.

In the collision the bow of the New Mexico penetrated the starboard side of the Oregon inflicting a severe wound to the latter vessel. The bow of the New Mexico suffered considerable injury but not of a nature to endanger her safety. Following the collision, and about an hour or an hour and a half thereafter, the Oregon, under conditions which will be hereinafter men-

tioned, undertook to proceed on her way to Boston. In the course of this effort, and due to the injury suffered in the collision, she sank between 1:00 and 2:00 p.m. the same day at a point about 20 miles northeast of Nantucket Shoals Lightship, with the resultant total loss of the ship and her cargo and the drowning of seventeen members of the ship's personnel.

The libelant herein is the owner of the Oregon and the action is under provisions of the Act of Congress of March 3, 1925, known as the Public Vessels Act, 46 U.S. C.A. §§ 781–799. Intervening petitions have been filed by E. J. Lavino & Company and by Defense Supplies Corporation, the owners respectively of the manganese ore and the wool which constituted the Oregon's cargo. A cross-libel has been filed by the United States for damage to the New Mexico.

The libel filed by the Oregon charges various acts of negligence against the New Mexico, the substance of these being that the officers of the latter were incompetent; that she failed to maintain a proper lookout; that she was negligent and dilatory in warning the Oregon of danger after it had become apparent; that, after the peril of a collision became evident, she failed to alter her course or speed or to take any reasonable action to avoid collision; that she failed to take proper steps to avoid collision or to mitigate the resulting damage; and that she failed to stand by the Oregon after the collision.

In turn, the answer and cross-libel filed by the New Mexico charges the Oregon with being in charge of incompetent persons and with failure to maintain an efficient lookout; that she failed to keep out of the way of the New Mexico by slackening her speed or by making a proper change of course; that she did nothing to avoid the collision after becoming aware of its imminence; that she altered her course improperly and without signaling to indicate such change of course. It is further charged that the Oregon was negligent following the collision in that, in view of her damaged condition, she was at fault in attempting to reach Boston instead of making for the nearest safe port or harbor,

and that she failed to take adequate and seamanlike measures to protect herself from the action of the seas.

During the pendency of this action and after some evidence had been taken in the form of depositions, the libelant asked and was granted leave, over the objection of respondent, to so amend the libel as to include a charge of negligence based on the conduct of the destroyers which were accompanying the New Mexico; the gravamen of this being that the destroyers, although in position to do so, failed to give warning to either the New Mexico or the Oregon of their respective dangers prior to the collision or to take other steps which might have averted the collision.

To an understanding of these various charges made against each other by the parties, and as to their merit or lack of merit, a somewhat detailed recital of the facts disclosed by the evidence is necessary.

The navy vessels were proceeding in a formation in which the destroyers formed a screen for protection of the New Mexico. In this formation the stations of the destroyers were on the arc of a circle 2,000 yards distant from the battleship. The station of the destroyer Hughes was 2,000 yards dead ahead of the New Mexico; the station of the Sims was 2,000 yards away on the port side of the New Mexico and 20 degrees forward of the latter's port beam; while the Russell was at the same distance on the starboard side of the New Mexico and 20 degrees forward of the New Mexico's starboard beam. These prescribed positions for the destroyers were always subject to some variation due to the impossibility of keeping them with exactness, especially at nighttime; but this variation appears to have been not more than a couple of hundred yards in distance or more than 10 degrees in direction. These vessels were following a base course of 236 degrees true but were zigzagging at intervals. In pursuance of the zigzag plan, a change of course had been made at 4:30 a.m. to a course of 216 degrees. This change had been made about 12 or 13 minutes before the collision and the evidence indicates that the destroyers, after

adjusting for the zigzag, were approximately on their prescribed stations at the time of the collision and had been for some minutes before, excepting that the Hughes, instead of being dead ahead, was in a position slightly off the starboard bow of the New Mexico.

With the navy vessels proceeding as above described and without lights, the Oregon, also unlighted, approached the formation from the general direction of the southeast and following a course, according to her testimony, of 340 true (i.e. 20 degrees west of north.) The course of the Oregon was such that she crossed the course of the Sims (the port destroyer) ahead of the latter and entered the navy formation (the area of the screen) between the Sims and Hughes (the lead destroyer), and a few minutes thereafter was engaged in the collision with the New Mexico.

The circumstances and happenings preceding the collision have been the subject of extended testimony which discloses a definite dispute as to the facts in some important respects. The nature of these differences can best be shown by a summary of the substance of the evidence offered by the respective parties.

As to the conditions of weather and visibility, there seems general agreement that the sky was overcast; that there was a moon which at the time was obscured by broken clouds of moderate density; that there was a diffusion of light through the clouds; that there was no rain or fog. Descriptions of the visibility by the witnesses vary between "good" and "fair". There is, however, some difference in the testimony as to the visibility in terms of distance. The master of the Oregon (Captain Gillette) estimates the range of visibility for an unlighted object such as a ship at between a mile and a half and two miles. The witnesses for the New Mexico estimate it at about two miles with the naked eye and from two and a half to three or four miles with binoculars.

### The Testimony for the Oregon

The recital of events preceding the collision as given by the master of the Oregon is substantially the following: That he, the second officer, and a lookout were on the bridge of the Oregon on the starboard side and keeping an alert watch when they observed a dark object (which later turned out to be the New Mexico) on the horizon bearing about four points (45 degrees) on the starboard bow and about a mile or less away; that he immediately ordered the running lights of the Oregon turned on, the accomplishment of which took about five seconds. That about fifteen or twenty seconds later the lights were turned on on the New Mexico. That the lapse of time between his first sighting of the loom of the New Mexico (as a dark and unidentifiable object) and the time when both ships were lighted was about twenty-five seconds. That during this period there was no noticeable change in the bearing of the New Mexico. That it was not until the lights of the New Mexico came on that he was able to determine her course and to discern that the ships were on intersecting courses. That at this time the distance between the vessels was about one-third of a mile. That he immediately ordered the helm "left", and a second or two later "hard left"; and that he did so in the belief that this offered the best chance of avoiding a collision and in the hope that the New Mexico would cooperate by turning to her right and that a collision could thus be avoided. That the collision occurred about one minute or less after he had given the order to turn left and that the Oregon had turned about 40 degrees and was about a ship's length to the left of her original course when the collision occurred. That the New Mexico appeared to be moving at a speed of 18 or 20 knots and made no change in her course until a few seconds before the vessels collided when she appeared to swing to her right; that she had swung about 10 degrees when the impact occurred. That as a result of these movements the bow of the New Mexico struck the starboard side of the Oregon at an angle of about 45 degrees, the point of impact on the Oregon being just forward of her bridge.

The captain of the Oregon further testified that from the time of sighting the New Mexico until the collision no effort was made to reduce the speed of the Ore-

gon and that she was still going at between 13-½ and 14 knots when the impact occurred; that thereafter he ordered her engines full astern. That, as soon as he ascertained the course of the New Mexico, he realized that under the crossing situation presented the New Mexico had the right of way and that under normal circumstances the rules of navigation called for the Oregon to turn to the right, but that the vessels were so near together that such action offered no chance to avoid a collision; that he believed that the only chance to avoid a collision, or to lessen the force of the impact, if a collision did occur, was to continue his speed and turn hard left, and he, therefore, pursued this course. He stated that in turning left the Oregon gave no signal by whistle or otherwise to indicate her intention so to turn.

The master of the Oregon estimated that the time which elapsed between his first sighting the New Mexico as a dark object until the collision occurred was about one minute and a half. He fixed the time of the collision at 4:43 by his ship's time. It appears that the Oregon had not seen any of the destroyers prior to the time when she started her left turn; that while turning she saw the lights of a vessel, the location of which she describes as slightly off her port bow and slightly closer than the New Mexico. (The evidence indicates that this was the Hughes, the lead destroyer.)

Jackson, an able seaman, who was at the wheel of the Oregon, testified that he was the first on that vessel to sight the loom of the New Mexico and that he called it to the attention of Captain Gillette. As to events thereafter, his testimony was in accord with that given by Captain Gillette, except in a few minor particulars. This witness states that the New Mexico turned on her lights "immediately" after lights were shown on the Oregon, that it was "only a matter of a few seconds". He estimated the lapse of time from the first sighting of the unlighted New Mexico until the collision to be "not much over a minute", and from the time the Oregon started to turn left until the collision at "not more than half a minute". However, this witness stated his inability to make any estimate of the distance between the ships at any time, other than to say that when the New Mexico showed her lights they were "very close". The second mate and another seaman who were on the bridge of the Oregon prior to and at the time of the collision were lost when the ship sank later in the day, and there was, of course, no testimony available from them. The chief engineer of the Oregon also testified at some length. However, his testimony related almost entirely to the engine room equipment and to the maneuverability of the vessel under various conditions, and he had no knowledge of the events preceding the collision. Therefore, no summary of his testimony seems necessary at this time.

### The Testimony for the New Mexico

The evidence on behalf of the New Mexico, gained from the testimony of various officers aboard her and on the destroyers, so far as relates to the collision and to the events preceding it, was substantially the following:

That prior to 4:30 a. m. the naval vessels had been on a course of 241 degrees and that at 4:30, in pursuance of the zigzag plan, they had turned 25 degrees left to a course of 216, which latter course they had been pursuing for some minutes prior to the collision. Lieutenant (jg) Waliszewski, who was officer of the deck on the New Mexico, testified that he had come on duty at 4:00 o'clock and was stationed on the forward part of the bridge; that visibility was good; that the range of visibility with the naked eye for a fair sized object like a ship was about 3,500 or 4,000 yards and with the aid of binoculars probably 6,000 yards; that the destroyers were approximately on their stations and visible to him with the naked eye. This witness states that two or three minutes after the New Mexico had made the zig-zag turn and steadied on course 216 he was sweeping the horizon with his binoculars and picked up the loom of a vessel (which later turned out to be the Oregon) bearing about 45 degrees off the port bow of the New Mexico and at a distance which he estimated to be 5,000 or 6,000 yards (2-½ or 3 miles); that the bearing of this vessel from the New Mexico was between the Sims and the Hughes and

that it appeared to be at least 2,000 yards ahead of and beyond the Sims. After looking toward the destroyers and thereby making certain that the vessel just sighted was not one of them, the witness called the strange vessel to the attention of Lieutenant Krick, supervisor of the watch on the New Mexico who was also on the bridge. As they were discussing the possible character of the strange vessel, the lights of the Oregon came on and, thereupon, Lieutenant Krick directed that the commanding officer of the New Mexico, Captain Brown, who was asleep in his sea cabin, be called. At the same time, he ordered the lights of the New Mexico turned on. Lieutenant Waliszewski walked to the Captain's cabin, a matter of seven or eight steps, and states that before he entered the cabin he heard the quartermaster report that the New Mexico's lights were on; that he entered the cabin and called Captain Brown who roused at once and came out on the bridge; that when he returned with Captain Brown the lights of both vessels were on.

The periods of time elapsing between these various steps were estimated by the witnesses as follows: From the first sighting of the loom of the Oregon by Waliszewski until the Oregon showed her lights, two or three minutes; from the lighting of the Oregon until lights were ordered on the New Mexico, ten or fifteen seconds, with the lapse of a few seconds more (three or four) until the New Mexico's lights came on. From the time Waliszewski started to go for Captain Brown until the latter was out on the bridge, twenty or thirty seconds.

Lieutenant Waliszewski also testifies that prior to the time the Oregon lighted up he was able to make an estimate of her course which he took to be about 310 degrees (approximately at right angles to the course of the New Mexico); that from the time the Oregon was sighted until her lights came on, and at that time, her bearing from the New Mexico was unchanged at about 45 degrees off the port bow.

Lieutenant Krick, who remained on the bridge while Lieutenant Waliszewski roused Captain Brown, testified that when the Oregon's lights came on she was at a distance which he estimated to be about 3,000 yards; that she appeared to have crossed the course of the Sims ahead of the latter vessel; that the Oregon's bearing was about 45 degrees off the port bow of the New Mexico and that she seemed to be on a course crossing that of the New Mexico at a right angle. Captain Brown arrived on the bridge, according to the testimony, about forty-five seconds or a minute after the Oregon first showed her lights and about a half-minute after both vessels had become lighted. On his arrival, he observed the Oregon with his naked eye and estimated her distance at close to 2,500 yards. He then procured his binoculars—a matter occupying about half a minute—and on observing the Oregon through them, estimated that she was then about 2,000 yards away and inboard of but ahead of the Sims. The testimony of the witnesses named was supported, with slight variation, by that of other members of the New Mexico's personnel; one exception being a signalman who estimated the distance of the Oregon at 1500 yards when she turned on her lights.

After Captain Brown had taken the Oregon under observation with his binoculars and estimated her distance at 2,000 yards, he continued the New Mexico on her course without change of speed, at the same time watching for any indication of a change in the course or speed of the Oregon. The New Mexico thus continued for a period estimated to be three or four minutes, during which time there was no change in the course or speed of the Oregon. By this time the ships had closed to a distance estimated at from 500 to 700 yards. In this situation and in the belief (as stated by him) "that the Oregon could not avoid a collision by her own efforts", Captain Brown gave the order "Right full; full speed astern", in an effort to swing the New Mexico as far as possible to the right and to slacken her advance, in the hope that the ships would clear. His orders were instantly obeyed and the New Mexico started swinging rapidly to starboard and had swung about 60 or 70 degrees when her bow collided with the starboard side of the Oregon at an angle of about 20 or 30 degrees. Simultaneously with the execution

of the order to swing the New Mexico to the right, a blast was blown on the ship's siren and a general alarm sounded. The time elapsing between the order to go hard right and the collision was approximately a minute or slightly more. That after the New Mexico had swung to the right and immediately before the collision the Oregon appeared to swing to her left. That when the ships came together the bow of the New Mexico had swung approximately 350 yards to the right of her original course. The New Mexico fixed the time of the collision at 4:42. The witnesses aboard the New Mexico were in agreement in testifying that from the time the Oregon was sighted and her course became apparent until she swung left immediately before the collision there had been no noticeable change in her course or in her bearing from the New Mexico; that during this period her bearing was at all times about 45 degrees off the port bow and her course appeared to be intersecting that of the New Mexico at approximately 90 degrees; and that from the time the course of the Oregon became ascertainable it appeared that the ships were probably on collision courses.

It may be noted that in the testimony of all the foregoing witnesses, for both the Oregon and the New Mexico, their estimates as to bearings and distances at various points and times were based on visual observations and not arrived at by the use of mechanical means.

Testimony was also had from persons aboard the destroyers, the substance of which was as follows:

From the Sims it was testified by Lieutenant Farley, officer of the watch, that the Sims was on a course of 216 true and approximately on her station 2,000 yards from the New Mexico when at about 4:35 the Oregon was sighted by the port lookout who at once notified Lieutenant Farley who was on deck. When sighted, the Oregon, then unlighted, was about 5 degrees off the port bow of the Sims (almost dead ahead), at a distance estimated at about 4,000 yards, and was crossing ahead of the Sims on a course which Lieutenant Farley estimated as being approximately 350 true.

The Captain of the Sims (who was later killed during the war) was at once roused and came on deck. The Sims reported the presence of the unknown ship to the division commander of the destroyers who was aboard the Hughes, using some means of inter-ship communication referred to as the TBS radio, and the signalman on the Sims was ordered to challenge the Oregon by means of the blinker tube. The Oregon gave no response or acknowledgment to the challenge and continued on her course. When the Oregon, after crossing the course of the Sims, had reached a position where she was about 40 or 45 degrees on the starboard bow of the Sims, the Oregon's lights came on; at which time she was about 1500 yards distant from the Sims. Immediately after lights appeared on the Oregon, the New Mexico's lights went on and the destroyers turned on their lights. Thereafter, so Lieutenant Farley testified, he heard the siren on the New Mexico but did not know there had been a collision until the Sims received a report to that effect from the Russell over TBS. Lieutenant Farley was unable to fix any time intervals between the various pertinent events prior to the collision, except that he estimated the lapse of time from the first sighting of the Oregon until he heard the New Mexico's siren as "within ten minutes or less".

From the Hughes, testimony was given by the commanding officer, Captain Ramsey, and by a signalman, Dickinson. The testimony of the former was to the effect that he was lying awake in the emergency cabin just off the bridge when the officer of the deck (Lieutenant Moyer) called through the voice tube and reported the sighting of a dark object off the port bow. Captain Ramsey immediately came out on the bridge and saw the unidentified ship bearing about 45 degrees on the port bow and at an estimated distance of 3,000 yards. The unidentified ship appeared to be ahead of the Sims and Captain Ramsey started to call the Sims through the radio telephone but before he could do so the Sims cut in and reported to him that it had observed the ship. Captain Ramsey directed the Sims to investigate the ship and also ordered the signalman on the Hughes to challenge

784

the ship with the blinker tube; he further ordered the guns of the Hughes to be trained on the approaching vessel with a view to firing on her if she proved hostile. Captain Ramsey further testified that he verified the course of the Hughes and found it to be 216 true, the prescribed course. That when he first saw the Oregon as an unidentified vessel, he estimated her target angle as 20 degrees which would have placed her on a course of 331 true. That as the Oregon approached and entered the formation she appeared to be changing her course to the right and assuming a course almost parallel with, but opposite to, that of the Hughes, resulting in a port-to-port passing of the two vessels. That he did not see the lights of the Oregon at the moment they came on but that when the Oregon had come abeam of the Hughes on the port side the lights of the Oregon were on; that the Oregon was then about 1,000 yards or more distant from the Hughes. That the Oregon at no time gave any answer or recognition of the blinker tube signals from the Hughes, but that when her lights came on he recognized her as a merchant ship. That as the Oregon passed abeam he looked astern toward the New Mexico and saw her lights on; that the New Mexico was at least 2,000 yards astern of the Hughes. That when he first saw the lights on the Oregon she was approximately 2200 yards from the New Mexico and that both the Oregon and the New Mexico were lighted when they were about 2,000 yards apart. That as the Oregon passed abeam, he (Captain Ramsey) considered her to be about 1,000 yards away and on such a course as that she and the New Mexico would make a clear port-to-port passing. But that when the Oregon had reached a position approximately 45 degrees off the port quarter of the Hughes he observed that the Oregon was turning left under the stern of the Hughes and between the Hughes and the New Mexico. That he did not see or hear the collision and did not hear the New Mexico's siren.

Dickinson, signalman on the Hughes, testified that as he watched the Oregon approach, after she had been sighted off the port bow, she appeared to be heading on a course parallel to the Hughes. That when the Oregon had reached a position 10 or 20 degrees forward of the port beam of the Hughes, he identified her as a merchant vessel and, acting on orders, began challenging her with the blinker tube and continued challenging for from one to two minutes, during which period the Oregon passed abeam of the Hughes and on toward the New Mexico. That he received no response to his signals at any time. That he estimated the distance between the Oregon and the Hughes as they passed each other at about 1500 yards and that the Hughes was on her station 2,000 yards ahead of the New Mexico. This witness first observed lights on the New Mexico and then on the Oregon, but his first notice of lights on either was at a time after the Oregon had passed the Hughes and was nearing the New Mexico.

The testimony from the Russell, given by Lieutenant Hart, officer of the deck on that vessel, adds little to that from the other ships. The Russell occupied the starboard position in the destroyer screen and was farthest from the path of the Oregon and from the scene of events preceding the collision. Lieutenant Hart first received information of the sighting of the Oregon by the report of the Sims over the inter-ship radio telephone. Following this, and through his binoculars, he located the Oregon bearing slightly more than 45 degrees off the port bow. The Oregon was then unlighted and appeared to be beyond the screen. As the Oregon came nearer, she appeared to turn to the right—this being inferred from the fact that she presented a broader target than when first sighted. Later, and after the Oregon entered the screen, Lieutenant Hart saw a red light appear on her, and then the lights on the New Mexico came on; following which the Russell lighted up. Lieutenant Hart testified that, to the best of his recollection, at the time he first saw the lights on the Oregon her bearing was just about on the beam of the Russell. Lieutenant Hart heard the siren of the New Mexico. He could not hear the collision but saw the ships merge and sur-

mised that they had collided. This witness made no attempt to estimate intervals of time between any of the events mentioned.

The foregoing outline of testimony of witnesses aboard the several vessels has been in considerable detail due to a belief on the part of the Court that it covers that portion of the testimony which is most pertinent to the important questions arising in the case and because it serves to bring into relief the rather limited issues to which the case has narrowed. The outline of the testimony given does not purport to include all, or even a major part, of all that appears in the record. The evidence in the case was voluminous and took a wide range into various aspects of navigation and the handling of ships. Some of this will necessarily be referred to later, but it is believed that the testimony hereinbefore summarized is that within which solution of the case must be found.

Briefly and broadly stated, the differences in the testimony offered by the two colliding ships as to the facts under which the collision occurred are these: In behalf of the Oregon it is stated that her first knowledge of the presence of the naval vessels was the sighting of the loom of the New Mexico and that thereupon she (the Oregon), as speedily as possible, lighted up. That when, following this, the New Mexico turned on her lights and thereby made it possible to ascertain her course, the two ships were so close together that the Oregon believed that the only chance to avoid a collision was for her to turn left while continuing her speed, which she did.

On the other hand, the New Mexico testifies that she sighted the Oregon while the latter was from 2-½ to 3 miles distant and that she had the Oregon under continuous observation for a period of approximately eight minutes or more before the collision. That both ships had become lighted when they were as far apart as a mile or more. That after both ships were lighted they continued on their respective courses for a period of three or four minutes and until they were from 500 to 700 yards apart when the New Mexico, in an attempt to avoid an impending collision, turned hard to her right; that the Oregon took no avoiding action until she turned to her left less than a minute before the collision.

### The Contentions of the Parties

Again, briefly and broadly stated, the contentions of the parties on the question of negligence are substantially as follows: The Oregon contends that having discovered the presence and course of the New Mexico only after the ships were in close proximity, she (Oregon) was faced with a situation of emergency in which she was forced to exercise her best judgment as to the course of conduct best adapted to avoid collision or to lessen the injurious effects thereof; and that the course which she pursued was proper and that she was without fault. On the other hand, she charges the New Mexico with negligence in that the New Mexico sighted the Oregon at a distance when no collision was imminent and when there was sufficient time within which to warn the Oregon of the danger into which she was heading; that the New Mexico, with knowledge of the approach of the Oregon, failed to turn on her lights or give other warning of her presence at a time when such warning would have enabled the Oregon to take proper avoiding action; that the New Mexico, with knowledge that the ships were on collision courses, continued on her course until the ships were so close that it was impossible for the Oregon to avoid collision by her own action alone, and that the New Mexico took no avoiding action until immediately before the collision and too late to be effective. The destroyers are also charged with negligence in not warning the Oregon of her danger at a time when they had opportunity to do so and when she might have taken steps to avert it.

The New Mexico on her behalf contends that, running darkened under wartime conditions, it would have been contrary to the dictates of military security for her to have turned on her lights or to have given other warning of her presence at the sighting of a strange vessel at a distance where no present danger of collision existed and the character of the vessel, whether friendly or hostile, could not be

determined. That when the Oregon threw on her lights, indicating her awareness of the presence of the New Mexico, the latter promptly followed suit; and that both vessels were lighted and in view of each other while they were a mile or more apart and when there was no imminent danger of collision. That under the crossing situation presented the New Mexico was required by the rules of navigation to continue her course and speed and that the duty was on the Oregon to avoid crossing in front of the New Mexico, which she had abundant time to do either by stopping or slowing her progress or by turning to the right and passing on the New Mexico's port side. That the Oregon failed to take avoiding action when she should have done so and had time to do so, but continued on her course until shortly before the collision when she turned to her left across the course of the New Mexico. That when, due to the lack of proper action on the part of the Oregon, it became apparent that a collision was imminent, the New Mexico turned as sharply as possible to her right in an attempt to prevent it. It is asserted that the New Mexico was without fault in any respect.

As to the Oregon, it is contended that she was negligent in not sooner discovering the presence of the New Mexico, and further that she was negligent in not taking steps to avoid crossing in front of the New Mexico after discovering the presence of the latter and when there was adequate time to avoid such crossing. That the Oregon negligently failed to give way to the New Mexico which was the privileged vessel and failed to avoid crossing ahead of the New Mexico, as required by the rules of navigation, but on the contrary negligently and without warning turned to her left and across the path of the New Mexico at a time which made it impossible for the New Mexico to avoid the collision.

In their respective contentions, based on their differing assertions of fact, both vessels rely upon the application of certain established rules of navigation. These rules, generally referred to as "International Rules for Navigation at Sea", are to be found in 33 U.S.C.A. Chapter 2,

§§ 61 to 142. Those pertinent here are the following:

Article 19, 33 U.S.C.A. § 104. "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

Article 21, 33 U.S.C.A. § 106. "Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed.

"Note.—When, in consequence of thick weather or other causes, such vessel finds herself so close that collision can not. be avoided by the action of the giving-away vessel alone,. she also shall take such action as will best aid to avert collision."

Article 22, 33 U.S.C.A. § 107. "Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

Article 23, 33 U.S.C.A. § 108. "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

Article 27, 33 U.S.C.A. § 112. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29, 33 U.S.C.A. § 121. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The libelants contend that the facts here show a case to which there must be applied the provisions of Articles 27 and 29 and that portion of Article 21 set out in the second paragraph (Note) thereto. In other words that the meeting of these vessels was under "special circumstances", in which the New Mexico failed in the duty

imposed on her by the provisions referred to. The respondent, on the other hand, contends that the facts show a usual case of vessels on crossing courses under circumstances in which the Oregon was compelled by the rules to keep out of the way; and that the Oregon failed in her duty in this respect; and that there were no special circumstances which relieved the Oregon from the consequences of her fault. These differing versions necessarily require a careful consideration of the conflicting evidence in order to determine the real facts surrounding this happening.

### Discussion.

In the first place it must be said that the testimony of the Oregon itself is such as to make it impossible to absolve her from fault in the events leading to this collision. Even if we were to accept her statement that she was confronted with a sudden emergency only a minute or more before the collision, it seems clear that her lack of care in the matter of previous watchfulness, resulting in her failure to discover the New Mexico sooner, was a cause of the emergency with which she was confronted.

It is testified by Captain Gillette that when both ships became lighted they were only about 700 yards apart and that it was about 25 seconds before this that he had first sighted the New Mexico. If these ships were on the courses and traveling at the speeds testified to by them respectively the distance between them was being lessened at the rate of about 824 yards a minute. Therefore, at the time when Captain Gillette says he first sighted the loom of the New Mexico (25 seconds before both ships became lighted) the ships were only 1044 yards apart, just a little over half a mile. At this distance the Oregon would have been about 900 yards within the screen after having passed between the Sims and the Hughes. These destroyers were somewhere between 2300 and 2600 yards apart and the Oregon must have passed not more than 1300 yards from one of them. The evidence indicates that she passed closer than this to the Hughes. Yet the Oregon testifies that she never saw either of these destroyers until she had started to turn left immediately before the collision and when all ships had lighted up.

The Oregon was sighted by the New Mexico, the Sims, and the Hughes at distances of from 3,000 to 5,000 yards. The New Mexico was a much larger vessel than the Oregon and presumably her loom would have been more (certainly not less) easily visible than that of the Oregon. There is the added fact that Captain Gillette testified that the visibility at the time for an unlighted object was between a mile and a half and two miles. In view of these facts, there seems only one explanation of the fact that the Oregon passed between the two destroyers without seeing either of them and came to a point about half a mile from the New Mexico before sighting that large vessel. The inescapable conclusion is that the Oregon was not maintaining a constant and alert lookout as she approached the scene and that this failure led her into the situation which she considered an emergency. To this testimony of the Oregon, there may be added that of the Sims and Hughes, to the effect that they both challenged the Oregon with their blinkers before or about the time she entered the screen. The Oregon states that she saw no such signals, but if it be true that they were given it emphasizes the failure of the Oregon's lookout.

But there are other features of the Oregon's testimony inconsistent with the foregoing and which tend to deny her claim that she was confronted with a sudden emergency. If this other testimony be accepted then, while it absolves the Oregon to some extent of the charge of inadequate lookout, it clearly points to fault in other respects. Captain Gillette states that when he first sighted the New Mexico she was at a distance of probably a mile. It is clear that this is not consistent with his statement that 25 seconds later, when both vessels had become lighted, the distance between them was only a third of a mile, and also with the statement that the time lapse between the lighting of both vessels and the collision was about a minute. In the space of 25 seconds the distance between the ships could not have lessened by as much as two-thirds of a mile (1333 yards). The actual reduction of distance would have been 344 yards. It is not desired to hold this witness,

or any other, too closely to estimates of time and distance where reasonable error might exist. But Captain Gillette was rather positive in his testimony in this respect, as shown by these excerpts from his testimony:

"Q. So according to your testimony both vessels were showing their running lights about twenty to twenty-five seconds after you first saw the New Mexico? A. Yes, sir.

* * * * * *

"Q. So that you had advanced toward each other about two-thirds of a mile in twenty-five seconds? A. Yes, sir.

"Q. You think she (the New Mexico) was as close as a third of a mile, Captain? A. Yes, sir.

"Q. When she turned on her lights? A. Yes, sir, I do."

It will be seen that the witness was positive that in the lapse of twenty-five seconds the distance between the ships was reduced from a mile to one-third of a mile, but he also testified that thereafter a minute was consumed in traveling the remaining, and much shorter distance, to the point of collision. At a constant speed, this could not be.

The pertinency of the foregoing is that it indicates that the ships were both lighted at a distance much greater than one-third of a mile. If this be true then, when taken in connection with other testimony of Captain Gillette, it points to a lack of care on the part of the Oregon from the time she sighted the New Mexico. If the New Mexico was a mile distant when sighted by the Oregon, as Captain Gillette testified, and both ships became lighted within 25 seconds thereafter, then they were both lighted when they were between 1600 and 1700 yards apart. When lighted, if not before, it was apparent that they were on intersecting courses and that the Oregon was the burdened ship obligated to keep out of the way of the New Mexico. At a distance of 1600 yards there was abundant opportunity for the Oregon to do this in several ways—by turning to her right and passing port-to-port, or by slowing her speed to permit the New Mexico to pass ahead. Had the dis-

tance been much less, the Oregon could have without difficulty taken action to avoid crossing ahead of the New Mexico. Captain Gillette testified that the Oregon, at a speed of 14 knots, could turn 90 degrees with an advance of 1200 or 1300 feet.

■ But aside from the question of the distance at which the ships were both lighted, it appears that the Oregon was lacking in due care from the time she sighted the New Mexico as a dark object 45 degrees off her starboard bow at an estimated distance of a mile. There was no land in this vicinity and no reason to suspect that the dark object was anything other than a ship. Its location off the starboard bow should have at once aroused thought of the possibility that the vessels were on intersecting courses and of the duty resting on the Oregon as the burdened vessel. Under such circumstances, prudence would seem to dictate that the Oregon should have at once slackened her speed or taken other steps to retard her advance until such time as she could obtain better knowledge of the situation confronting her, instead of pursuing her course at full speed, in seeming disregard of possible danger. The authorities seem clear that when one ship has sighted another under conditions which raise the possibility that they are approaching under conditions which will impose upon the former the burden to keep out of the way, ordinary prudence requires that she should assume that this situation will develop and should act accordingly, even though at the time of sighting the course of the other vessel is not ascertainable. In Matton Oil Transfer Corp. v. Conners Marine Co., 2 Cir., 130 F.2d 195, 196, it is said, "When the Dynamic first made out the Cree, she had the Cree on her starboard hand, and the Cree's course was not yet apparent. * * * That being the situation, the Dynamic was charged as the giving way vessel until the Cree's navigation disclosed that they were not on crossing courses." And see Ocean S. S. Co. v. United States, 2 Cir., 38 F.2d 782, 784; Wilder's S. S. Co. v. Low, 9 Cir., 112 F. 161, 171, 172; The Buenos Aires, 2 Cir., 5 F.2d 425, 428; The Manaway, D.C.Va., 257 F. 476.

■ Moreover, Captain Gillette further testified that from the time he sighted the New Mexico until the latter was lighted her bearing showed no noticeable change. This in itself was an indication that the ships were on collision courses. And certainly when this became apparent the Oregon should promptly have taken avoiding action. The Maverick, 2 Cir., 84 F. 906, 908.

It may be argued that Captain Gillette was mistaken in his estimate of a mile as the distance at which he sighted the New Mexico and that the distance was less. This is, of course, possible; but there are limits to the extent of any probable error and even if the distance were as little as two-thirds of a mile the fault of the Oregon would still appear. In the first place, this would emphasize the deficiency in the Oregon's lookout. And even at two-thirds of a mile there were available to her the precautions which she failed to take and which have been heretofore stated.

Again, it should be noted that when the Oregon sought to take avoiding action briefly before the collision she did so by turning left across the path of the New Mexico. This was an unusual and unorthodox course of action, as Captain Gillette himself recognized, but which he took in the belief that it afforded the best chance of avoiding collision. His hope, so he says, was that the New Mexico would "cooperate" by turning to her right and it is argued that had the New Mexico promptly done so the ships would not have collided. But the Oregon gave no warning or signal of any sort to indicate the unusual action upon which she had decided—an action just the reverse of that normally to be pursued and contrary to that which the New Mexico had a right to expect. It would seem that when a ship changes course the movement is not discernible from an observing ship at the instant the helm goes over. There is some lapse of time, though it may be short, before the turning ship has swung sufficiently for the turn to be noticeable from the other vessel; and this would be particularly true in the darkness when the change of course would be noticeable to an observer only after the turning vessel had swung sufficiently to permit observation of a change in her silhouette or in the position of her lights. The very fact that the Oregon decided to pursue the unusual course of turning to her left dictated that she should have instantly, by whistle or other signal, given notice to the New Mexico of her intention; and unless she did it is difficult to see how or why she should expect the New Mexico to cooperate.

Summarizing the behavior of the Oregon as disclosed by her own evidence, it appears that she was first negligent when, after sighting the loom of the New Mexico, she continued on her course at full speed without regard to the evident possibility that the ships were on crossing courses.

Again, if both ships became lighted when as much as 1600 yards apart, as appears probable, the Oregon was negligent in not taking action at once to avoid crossing ahead of the New Mexico.

On the other hand, if the Oregon discovered the New Mexico only 25 seconds before the ships were as close as 700 yards (which would place the distance of discovery at 1,000 to 1100 yards and well within the screen), then it is evident that the Oregon's lookout was not alert.

And the Oregon was again at fault, when, on deciding to pursue the unusual course of turning to her left across the course of the New Mexico, she failed to give any warning of her intention.

A somewhat unusual feature of the evidence in this case is that the witnesses on both the Oregon and New Mexico testify that, as the vessels approached, they believed their courses to be converging at approximately 90 degrees; and that the bearing of each ship from the other was "broad (approximately 45 degrees) on the bow". However, the testimony as to their own courses respectively is that the Oregon was on a course of 340 and the New Mexico on one of 216. If these are correct, then the angle of incidence between their courses was 124 degrees, not 90; and the bearing of each from the other was 28 degrees on the bow. But even if the latter situation be the true one, it is not seen how it affects the respective contentions of the vessels as to the responsibility for the col-

lision. It is true that if the courses of the ships were converging at 124 degrees the opportunity of the Oregon to avoid collision by turning to her right would have been greater and could have been exercised at a later stage than if the ships were approaching at right angles. But the action of the Oregon must be judged in the light of what she believed to be the situation and which was the same situation that was depicted to the New Mexico.

### The Action of the New Mexico.

As previously stated, the New Mexico admits that she sighted the Oregon at a time when the latter was at a distance of two or two and a half miles, and at a time some six to eight minutes before the collision. She also admits that soon after the Oregon was sighted it became apparent that the ships were probably on collision courses, although no collision was then imminent. The New Mexico further admits that she made no alteration of her course or speed until about a minute before the collision. From these facts, the Oregon contends in substance that the New Mexico, with full knowledge of the danger of a collision and with adequate time to prevent it, failed to turn on her lights or otherwise warn the Oregon of the danger but continued to bear down on the unsuspecting Oregon until the vessels were so close as to make the collision inescapable. This argument is based on the premise, as testified by the Oregon, that the ships were within 600 or 700 yards before they both became lighted. It is this premise which the New Mexico denies. She insists that both ships were lighted when distant from a mile to a mile and a half and in abundant time for the Oregon to take any one of several courses of action to avoid crossing the course of the New Mexico.

The New Mexico justifies her conduct under the International Rules for navigation of vessels at sea, Art. 19 and Art. 21, heretofore referred to, which imposed on her the duty to pursue her course and speed and imposed on the Oregon the burden of keeping out of the way. The New Mexico does not contend that these rules are so imperative as to excuse a privileged vessel for continuing on her course into a collision with an unsuspecting ship or to excuse the privileged vessel from a failure to take avoiding action on her own part when it becomes apparent that only by doing so can a collision be averted. She contends, however, that in this case the Oregon was aware of the situation at a time when no collision was imminent and in adequate time to take avoiding action, and that the New Mexico acted properly and without fault in adhering to the rules which required her to maintain her course and speed. It will be seen, therefore, that the question of the distance at which both ships became lighted is one of primary importance.

On weighing all of the evidence in this case, I am convinced that both of the ships had become lighted at a time when the distance between them was not less than 1500 yards and possibly as much as 2500 or 3,-000 yards. The testimony of the witnesses aboard the New Mexico is definitely to this effect and it is strongly supported by that from the Sims and the Hughes. There is some variation in the estimates of distance by those aboard the New Mexico, but they appear to be such as might be expected from a number of individuals, each giving his individual opinion. Without attempting to repeat the testimony of the separate witnesses, it may be said that it is in agreement to the effect that both ships were lighted when they were from 2,000 to 3,000 yards apart. The only exception is in the testimony of a signalman, Davis, who estimated the Oregon to be 1500 yards away when he saw her lights come on.

The testimony from the New Mexico (with the exception noted) is to the effect that the Oregon became lighted slightly before she entered the screen and this is supported by the testimony from the Sims and the Hughes, the two destroyers between which the Oregon passed on entering the screen and which were the closest to her at that time. The Sims testifies that the Oregon, after passing ahead of the Sims, had reached a position 40 to 45 degrees off the Sims' starboard bow when she turned on her lights. This would place the Oregon just about on the arc of the screen or a little beyond. This is confirmed by the Hughes, the lead destroyer, who testifies

that when the Oregon was abeam of the Hughes the former's lights were on. This also fixes the Oregon as being lighted when she entered the screen, or a little before. There is no dispute that the New Mexico was lighted within 20 seconds after the Oregon.

The Oregon urges that her claim as to her position when she lighted up is borne out by the testimony of the Russell and the Hughes. It is true that it finds some support, though to a limited extent, in the testimony of Lieutenant Hart, who was deck officer on the Russell. Lieutenant Hart stated that when the lights of the Oregon came on her bearing was, to the best of his recollection, about off the port beam of the Russell. This would place the Oregon deep within the screen at the time and pretty close to the New Mexico. However, the witness stated that his testimony in this respect was "only an estimate and subject to considerable error". When asked to estimate the interval between the time when both vessels were lighted and the time when they appeared to merge, he said that he felt it was "an appreciable time". Asked as to the distance between the Oregon and New Mexico when they both became lighted, the witness stated that it was his impression that they were "not in real close quarters" and that there was opportunity for them to clear each other; and when asked if the distance was as much as a thousand yards, he stated that it "could have been that far; it could have been more and it could have been less". Lieutenant Hart emphasized that the events testified to were not sharp in his memory and that he was testifying from a recollection that was "hazy" and without any feeling of confidence in the accuracy of his estimates. The only point of definite difference between this witness and those aboard the other naval vessels is as to the position of the Oregon when she turned on her lights. There is nothing apparent in the evidence to explain this difference; although it should be noted that the Russell was much farther from the scene of events than any of the other ships, and that Lieutenant Hart's recollection was admittedly uncertain.

I cannot accept the Oregon's contention that her testimony as to the time when she lighted up is supported by that of the Hughes. This argument is founded on a supposition that the Hughes was not on a course of 216 but on one substantially to the left of that; and that, therefore, if the Oregon turned on her lights when off the port beam of the Hughes, the Oregon at that time must have been well within the screen. The basis for this supposition is in the testimony of one of the witnesses aboard the New Mexico, Ensign Johnson, who, in the course of his recital of the events, stated that after lights appeared on the destroyers he observed the Hughes and that she appeared to be on a course close to 45 degrees to the left of that of the New Mexico. However, this was at a time after all the ships had become lighted and this same witness testified that the Oregon showed her lights while she was still outside the screen and at a distance which he estimated at 2500 yards. To accept this single bit of testimony as to the course of the Hughes as it appeared to a witness on the New Mexico and to deduce from it a conclusion as to the position of the Oregon would require that all of the other testimony of the same witness be ignored. It would also require a complete denial of the testimony of the Hughes itself, whose commanding officer testified definitely that the Hughes was on a course of 216 and that the New Mexico was within a few degrees of being dead astern and at least 2,000 yards distant. And further stated that as the Oregon passed abeam of the Hughes and about 1,000 yards away, he had both the Oregon and the New Mexico in sight, that they were both lighted at that time, and were approximately 2200 yards apart.

In the extremely voluminous and detailed testimony of the various witnesses in this case, there are no doubt some variations and discrepancies. This is always true in a recital of events from a number of persons who have observed the happenings under differing conditions and positions and whose testimony involves estimates of time and distance. By picking out single bits of testimony here and there and ignoring the rest of the testimony, almost any theory can be built up in almost any case. But a careful consideration of all the evidence here shows that the strong weight of it is to the effect that the Oregon turned her

lights on when distant from the New Mexico not less than 2,000 yards, and possibly more; and that both ships were lighted at not less, and possibly more, than 1600 yards.

■ It remains to consider the behavior of the New Mexico in the light of the conclusions stated above. I am not impressed with the thought that the New Mexico should have lighted up or otherwise made her presence known immediately on sighting the Oregon. The country was in a state of war with Japan and with the practical certainty that war with Germany would be declared within a few days (as it was); and the action of the Japanese had warned us that our enemies might attack at any time and without a declaration of war. Following the attack at Pearl Harbor, which had resulted in the loss of a number of the capital ships of the navy, the protection of the New Mexico, as one of the few survivors of that class, was of great importance. It was for reasons of security that she was traveling blacked out and in a protecting screen. These precautions would have meant little if the New Mexico, immediately upon sighting an unidentified vessel at a distance which offered no immediate expectancy of a collision, had made her location and course known to the stranger without waiting to ascertain whether the latter was hostile or friendly.

In arguing that the New Mexico should have shown her lights at once upon sighting the Oregon, the libelants cite a number of cases dealing with darkened ships, including The Pierre Loti, 78 Lloyds' L.R. 193, 196, and the Dominion Monarch, 71 Lloyds' L.R. 110, 114 (both English cases); The Cushing, 2 Cir., 292 F. 560; The Corozal, D.C., 62 F.Supp. 123, and others. In the case of The Pierre Loti, the court seemingly laid it down as a fixed rule that vessels navigating without lights under war conditions should always switch on their lights as a first precaution when sighting an approaching vessel whose course was not readily ascertainable. But examination of that case, as well as the others cited, shows that they dealt with situations where the faulting ship did not light at all or lighted so belatedly as to be of no benefit in the avoidance of an accident. None of these cases hold that a vessel which lighted in plenty of time to permit another to take avoiding action is to be blamed for not having lighted sooner; and no authority is cited to the effect that a ship moving darkened in war time must immediately show her lights on sighting another vessel, no matter how far distant the other may be. That there is no such definite rule of conduct as the language used by the court in the Pierre Loti might indicate is shown in the case of The Hopepeak, 79 Lloyds' L.R. 537, 540, where the court absolved both ships from blame for failing to put their lights on where their failure was due to the apprehension held by each of them that the other might be hostile.

■ It is not meant to imply that the New Mexico would have been justified in continuing on her course indefinitely without making her presence known to the Oregon, or to imply that, no matter how closely the ships approached, there would have been no duty on the New Mexico to give warning to a ship which was apparently unaware of its danger. If these ships had approached in darkness to a point where danger presently threatened, of which the Oregon appeared to be unconscious, the New Mexico would not be excused from a failure to take the initiative in avoiding that danger, by warning the Oregon of her approach. The important question is whether the New Mexico was lighted in time for the Oregon to ascertain her course and to take avoiding action. If she was then it is not material which ship lighted first or that the New Mexico did not light sooner.

■ When these ships had both become lighted at a distance of from 1600 to 2,000 or more yards, as the evidence forces me to believe, they were in no immediate danger of collision. At that time, they were admittedly aware of each other's presence and the crossing situation was, or should have been, apparent to them both. It was the not unusual situation of two vessels approaching on intersecting courses. For the regulation of this situation, there are definite and well-known rules of navigation. These rules directed that the New Mexico, as the privileged vessel, should keep her course and speed; and required that the Oregon should keep out of the way

of the New Mexico and avoid crossing ahead of her. This duty the Oregon could have fulfilled by slackening her speed or, even more easily, by turning to her right and passing the New Mexico to port. There was adequate time to take either course, or both. I know of no authority which suspends the application of this rule during the nighttime. Of course, a situation invoking the rule would probably become more quickly discernible in daylight; but when it has once become apparent in time to put the rule into play effectively, as it did here, the course of action prescribed would apply whether at night or in the day. See The Jarrix, 1 Lloyds' L.R. 93, 95, where it is pointed out that darkened ships, by turning on their lights, and disclosing their courses, bring the crossing rules into play. And see The F. J. Wolfe, 79 Lloyds' L.R. 111.

■ This rule directing that the privileged vessel shall keep its speed and course means more than merely to bestow a favor of which the vessel can take advantage at its option. The provisions of the rule are definite and positive and adherence to it conduces to the safety of both ships involved in the crossing. It is in order that each ship should know what the other is going to do. In order that the burdened vessel, in maneuvering to keep out of the way, may do so with the assurance that the privileged vessel will continue its course and speed and will not indulge in some unexpected and unpredictable alteration of speed or course that would render ineffective the efforts of the burdened vessel. And in order that the privileged vessel, in continuing on its way, may be assured that the burdened vessel knows it will so continue and will adapt its action to this knowledge.

The imperative quality of the crossing rule has been stated in numerous cases. In The Norfolk, D.C., 297 F. 251, 255, in speaking of the obligation of the holding-on vessel to keep her course and speed, the court says that "This duty is as definite and precise as the duty of the burdened vessel to keep out of the way." In the case of The Piankatank, 4 Cir., 87 F.2d 806, 810, it is said:

"Where two courses are open to a vessel, and particularly to the privileged vessel, one to follow the prescribed rules and the other to depart from them, the duty is imperative to observe the rules, and to assume that an approaching vessel will do likewise, until after the danger has become so manifest as to show that there is no proper choice of judgment other than that of departing from the rules. Any other course would lead to confusion and be a most prolific source of accidents. Indeed the rule is so imperative that it does not give a navigating officer any general latitude as to obeying the rules, and permits a departure only when necessary to avoid immediate, and not remote or problematical, danger, and then only to the extent required to accomplish that object."

See also The Oregon, 158 U.S. 186, 202, 15 S.Ct. 804, 39 L.Ed. 943; Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 462, 48 S.Ct. 369, 72 L.Ed. 651; The Boston, 2 Cir., 277 F. 36, 40; The Delaware, 161 U.S. 459, 469, 16 S.Ct. 516, 40 L.Ed. 771; The R. R. Kirkland, D.C., 48 F. 760, 763.

In Belden v. Chase, 150 U.S. 674, 699, 14 S.Ct. 264, 272, 37 L.Ed. 1218; it is said:

"Obedience to the rules is not a fault, even if a different course would have prevented the collision; and the necessity must be clear, and the emergency sudden and alarming, before the act of disobedience can be excused. Masters are bound to obey the rules, and entitled to rely on the assumption that they will be obeyed * * *".

And see Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., 2 Cir., 215 F. 859, 862, 863, where the rule requiring a privileged vessel to hold her course and speed is held to be so imperative that a privileged vessel which altered her course and sought to justify her action under Article 27 was held to be at fault for having acted prematurely and before there had arisen the "immediate danger" which justified a departure from her course.

In Farwell's Rules of the Nautical Road, p. 176-7, the author summarizes the obligations of steam vessels on crossing courses involving risks of collision, as follows, as-

suming A as the privileged vessel and B the burdened vessel:

(a) A must hold course and speed across B's bow, unless and until B's wrongful action forces her into the jaws of a collision.

(b) A cannot properly announce her intention to do this by whistle signal, as every whistle signal contained in the International Rules, except fog signals, indicates a change in course or speed. She may give notice by a flare-up light or a detonating signal, but this is only a permissive, not a required signal.

(c) B is required to keep out of the way, to avoid crossing A's bow, and if necessary to slacken her speed or stop or reverse.

(d) If B keeps out of the way by sheering to the right she must sound one blast; if by sheering to the left, two blasts; if by reversing, three blasts. A, holding on, cannot reply.

(e) If B does not give way as required, it is A's duty to maintain course and speed as long as possible, i. e. until in such proximity that it is no longer possible for B to avert collision unaided. A must then take such steps as in her judgment will best assist in preventing collision, indicating any change in course or reversal of engines by appropriate signal of one, two or three blasts.

In the instant case, it is clear that so long as these ships were far enough apart for the Oregon to have avoided collision by her own efforts the New Mexico had a right to assume that she would do so; and the New Mexico was not only justified in maintaining her course and speed but was required to do so. Only when it became apparent that the Oregon could not, by her own efforts alone, extricate herself from danger did it become incumbent on the New Mexico to act. It would not have been proper for her to have done so sooner. The Court is not able to point out any exact moment when it should have become apparent to the New Mexico that the Oregon could not save herself. Captain Brown says that as soon as that situation appeared to him to exist he took all such steps as were possible to avoid the collision. I am unable to say that he was at fault in not having done so sooner, and it has not been pointed out that the steps which he took were improper or inappropriate.

Counsel for all parties in interest have sought out and furnished to the Court citations to a large number of cases dealing with the various aspects of the case which they have deemed pertinent. Their diligence in this respect is praiseworthy and is appreciated. But the value of most of these cases, as is usually true, lies in their applicability to particular states of fact. Many of them relate to assumptions of fact which the Court has found not to exist here and for that reason no further reference need be made to them.

There are several other aspects of the evidence in this case which have been the subject of extensive and earnest argument by counsel for libelants; and, although I feel that the material facts upon which decision of the case turns lie within the evidence hereinbefore recited, these other matters should perhaps be commented on, lest it be thought that they have been overlooked.

Much is said about the entries in the log books of the New Mexico and of the destroyers touching the events of this collision and it is argued that they discredit the testimony of the witnesses and that the entries are conflicting and unreliable. Undoubtedly the entries in the logs show discrepancies and contradictions in regard to the times of various happenings, and this the respondent does not dispute. But these would seem to be attributable to the conditions under which the entries were made. On the New Mexico, for example, if I understand correctly, a seaman known as the "quartermaster's striker" stationed on the navigating bridge had the duty of noting the time of events and entering them in a notebook. Still another such record was kept by a signalman on the Flag bridge. There was also what is referred to as the deck log in which the entries were made by the officer of the deck. In none of these several "rough logs" do the various entries purport to have been written contemporaneously with the events recited. They were all made after the happenings and represent the different writers' recollection of the time and sequence of the various

events. Under such conditions, it is to be expected that differences in estimates of time intervals would appear in the different logs. What is referred to as the "smooth" log was still later recorded in typewriting by reference to the data contained in the "rough" logs. It is apparent that there are differences and inconsistencies between the rough logs kept on the New Mexico and between these and the rough logs on the destroyers, as well as differences between the rough logs and the testimony of witnesses at the trial. For example, the quartermaster's notebook on the New Mexico contains notations which might indicate either that the collision occurred at 4:35 or at 4:40, while the log of the Hughes notes 4:43 as the time of her first sighting of the Oregon 3,000 yards away. Again the commander of the Sims reported 4:43 as the time when the New Mexico sounded her siren and reported the sighting of the Oregon as eight minutes before, at 4:35. Yet the commanding officers of the New Mexico and of the Oregon are in substantial agreement in testifying as to the time of the collision, fixing it at 4:42 and 4:43 respectively. Here again if we pick out one entry from one log or report and another from another, many versions of the accident can be constructed. But it is to be noted that, with one exception, each log or report that noted the turning on of the Oregon's lights fixed it at a substantial time (from four to eight minutes) before the collision.

Criticism is made of the fact that at no time after sighting the Oregon did the New Mexico seek to determine the bearing of the Oregon by use of the instrument known as the pelorus. I see no pertinency in this argument. It is admitted by the New Mexico that from shortly after sighting the Oregon it was apparent that the vessels were probably on collision courses, as evidenced by the fact that the bearing of the Oregon remained unchanged. Use of the pelorus would not have changed this fact. It could have served no further than merely to confirm what the New Mexico had already ascertained by visual observation.

It is urged also that the New Mexico was negligent in that she did not have look-outs at all such stations as are required by naval regulations and that there were no reports from lookouts until after the officer of the deck (Lt. Waliszewski) had first sighted the Oregon. These charges, if true, might have a bearing in a case where a ship was belated in discovering the presence of another; but under the circumstances here they seem entirely immaterial. The New Mexico admits sighting the Oregon when the latter was two or three miles away. With this fact admitted, the identity of the person who first sighted the Oregon is of no moment—whether it were a lookout, the officer of the deck, or someone else. It is also argued that the destroyers were negligent in failing to warn the New Mexico as soon as they discovered that the Oregon was crossing into the formation. This would seem equally immaterial in view of the admitted fact that the New Mexico had the Oregon under observation almost as soon (possibly as soon) as the destroyers did.

 In a vigorous attack by the libellants on the credibility of the witnesses for the respondent, emphasis is laid on the fact that the respondent did not take the testimony of certain witnesses who are asserted to have been available. The only such witnesses who are specifically named are three in number, a Lieutenant Gentry aboard the New Mexico, a Lieutenant Moyer from the Hughes, and the quartermaster's striker (Hoover) from the New Mexico. From the fact that these persons were not called to testify the Court is asked to assume that had they been called their testimony would have been damaging to respondent and in denial of that of all the witnesses whom the respondent did produce. Indeed, the libellants appear to argue that the Court must assume that the absent witnesses were all truthful men who would contradict the witnesses who did testify and that therefore all the latter are proven to be untruthful. While I recognize the fact that when a litigant fails to offer witnesses who are available a court may draw the inference that their testimony would not be helpful, I know of no principle that goes so far as the libellants appear to contend. The Court does not know whether the witnesses mentioned were

available or not and, of course, does not know what they might testify to. But when there are a dozen witnesses to an event and two of them are not called to testify, I know of no authority which compels a court to discredit entirely the testimony of the other ten.

## Happenings Following the Collision.

In addition to defending on the ground that the New Mexico was without fault in the collision, the respondent has asserted that the sinking of the Oregon later in the day with the loss of the ship and cargo and the lives of a number of her personnel was due to the negligence of her master in attempting to pursue his course to Boston instead of taking refuge in a nearer port.

While I am of the conclusion that the New Mexico was without fault in bringing on the collision and therefore not liable for its results, it is possible that an appeal will be taken from my findings, in which case the parties should have an opportunity to have the appellate court pass upon all questions which may affect the liability of the parties. For that reason, it seems desirable to discuss the events following the collision.

The Oregon and the New Mexico were both turning from their original courses when they collided and in the collision the point of the bow (the stem) of the New Mexico struck the starboard side of the Oregon at an angle, variously estimated by the witnesses at from 20 to 40 or 45 degrees. The point of impact on the Oregon was slightly forward of her bridge and about two-fifths of her length back from her stem. When the ships struck the Oregon was moving at full speed, while the New Mexico was slackening hers. The sides of the ships swung momentarily in contact, after which the headway of the Oregon (possibly aided by the impact) carried her on forward, while the New Mexico dropped astern. The wound in the side of the Oregon, as described by her master, was a V-shaped gash which cut into the main deck a distance of about 10 feet from the rail. At the rail the cut was 10 or 12 feet wide, measured in a fore and aft direction, and narrowed as it extended down the side of the ship to a point about a foot above the water line.

Following the collision, the New Mexico turned a searchlight on the Oregon which disclosed the hole in the latter's side. The identity of the Oregon was ascertained and the Sims was ordered to stand in close to her and find out the extent of the damage and whether the Oregon needed assistance. Meanwhile the other naval vessels maneuvered in the immediate vicinity for about an hour. During this time the master of the Oregon and his chief engineer made such examination as they could of the damage to the Oregon. The damage did not appear to extend to the lower hold and while there was some water in several of the holds it appeared to be easily controllable by the pumps. The wind and sea were moderating and Captain Gillette concluded that he could proceed under his own power. The admiral in command of the naval squadron was informed of the decision of the Oregon to proceed and he ordered the Sims to escort the Oregon and stay with her as long as needed. Accordingly, about an hour or a little more after the collision, the Oregon proceeded on her course, accompanied by the Sims. The other navy ships resumed their course to Norfolk. This was about 5:50 or 6:00 a. m.

After leaving the scene of the collision the Oregon proceeded at slow speed for half an hour or more; thereafter, as the pumps gained on the water in her hold and the wind and sea continued to moderate, she gradually increased to full speed. She arrived off Nantucket Shoals Lightship, about forty miles north of the scene of the collision, around 10:30 a. m. Prior to that time, the Sims, cruising along with the Oregon, had inquired of the latter on several occasions as to whether she was all right and whether she desired further escort. Each time the Oregon asked the Sims to continue further. However, when the ships had reached Nantucket Shoals Lightship about 10:30, the Oregon was making full speed, all water had been pumped from her holds, the weather was fair and the sea smooth, and under these favorable conditions and prospects Captain Gillette informed the Sims that he thought he could get along without further escort. The Sims then turned back to rejoin the naval formation.

At the time the Sims left, Captain Gillette says that he felt quite sure that he could continue to Boston in safety. Accordingly, he turned to the northeast with the intention of rounding the Nantucket Shoals and then bearing north and northwest past Cape Cod and on to Boston. For about an hour after leaving the Lightship the Oregon proceeded under favorable conditions at a speed of 14 knots. About 11:30 the weather conditions changed noticeably. The wind rose and shifted from west to southwest, accompanied by rising seas, and the barometer began to fall. A mat made out of awnings was fastened over the wound in the ship's side and the speed of the vessel was slackened. About noon a radio message was sent out giving the ship's position and asking assistance. This was answered by a steamer named the Tydolgas, stating that she could reach the position within an hour. However, after this conditions rapidly became worse. The wind and sea increased and the roll of the ship caused her to take water through the hole in her side, despite efforts to keep her port side to the wind. The water in the hold kept increasing despite continuous operation of the pumps. The ship was unable to make any appreciable headway and her efforts were devoted to maneuvering to keep afloat until such time as help might arrive. By 1:00 o'clock the Oregon was low in the water with the sea breaking over her forward end. The Tydolgas arrived on the scene about 1:00 and was asked to stand by in case the Oregon had to be abandoned. Sometime between one and two o'clock, when it was evident that the Oregon would sink, Captain Gillette ordered the lifeboats lowered and the ship abandoned. Captain Gillette, after remaining aboard until he saw that both lifeboats were clear and away from the ship's sides and that there was no one remaining on the Oregon, jumped overboard and swam to lifeboat No. 1. A few moments after this boat was swamped and overturned by a heavy sea. Seventeen of the men in the boat were drowned; seven, including Captain Gillette, were rescued by the Tydolgas. All the occupants (eighteen) of lifeboat No. 2 were rescued. The Oregon sank about five minutes after the lifeboat had capsized.

The point at which she sank was estimated by Captain Gillette as being about twenty and a half miles due northeast of Nantucket Lightship.

On these facts the respondent argues that the Oregon's master was negligent in attempting to round Nantucket Shoals and complete his voyage to Boston; that in view of his ship's condition ordinary prudence dictated that he should have abandoned any effort to reach Boston and should have steered for the nearest point of safety, which the respondent points out as being the island known as Martha's Vineyard.

I am unable to accept this view. In leaving the scene of the collision the Oregon proceeded cautiously at first, quite evidently to observe and test out the abilities of the ship to proceed. This speed was gradually increased and for an hour or so before reaching the Lightship she had been making full speed with no bad effects observable. At the time she reached the Lightship all water had been pumped out of the Oregon and there was no sign that any was entering, certainly none that was beyond easy control. The weather was fair and the sea relatively calm. There was nothing to cause anticipation of a change in these conditions, and no weather reports or forecasts were available to the Oregon. At the time the wind was from the west and, while it was not high, it was desirable that the Oregon's course should be such as to keep the wind on the port side. Under all of these conditions, I am unable to say that Captain Gillette was not justified in believing that he could make Boston in safety or that he was guilty of bad seamanship in attempting to do so. The behavior of his ship up until that time indicated that if weather conditions held he could reach Boston—as he probably could have. And if there was to be any adverse change in the weather, Captain Gillette had no way of predicting the nature of the change or to foretell that, as result of it, one course would be more or less dangerous than another.

Respondent argues that the conditions of the sea which the Oregon encountered off Nantucket Shoals were normal for that

vicinity and such as Captain Gillette should have anticipated from his knowledge of those waters. I do not think this supposition is justified. While it is admitted that the waters off Nantucket Shoals are notoriously choppy, the evidence indicates that there was an increase in the velocity of the wind and a shift in its direction after the Oregon left the Lightship, and that her difficulties were due to the resultant heightening of the seas and to the difficulty of keeping her port side to the wind while pursuing a course of 70 degrees true—the course required in order to avoid the shoals.

While the distance from Nantucket Lightship to Boston is longer than that to Martha's Vineyard, there are other factors which might well have influenced Captain Gillette's decision to pursue the course he did. He knew that after rounding the shoals his further course would be · one comparatively sheltered from the effect of westerly winds. On the other hand, he says he did not know the waters around Martha's Vineyard; and it appears that his course to that place would have been across deeper and more open waters in which, in case of rising winds, the waves would have risen higher than in the more shallow waters which he chose to navigate. It is possible, of course, that the filling of the Oregon's holds with water was caused by some undiscovered damage · below her water line. But this does not seem plausible in view of Captain Gillette's testimony that her holds were "dry" when she reached the Lightship some four or five hours after the collision. It seems more probable that the water entered the ship because' there had been, as Captain Gillette stated, a decided increase in the wind, beginning about noon, and that the rising seas caused water to lap into the hole in the Oregon's side. In either case it does not appear that any course different from the one pursued would have been safer. Captain Gillette testified that when he reached the Lightship the condition of his ship and of the weather was such that "I had no doubt that we could make port safely". That in this belief he felt no need for the further presence of the Sims and he authorized the latter to terminate her escort.

██ Under all of the circumstances recited, the Court is unable to say that the Oregon was negligent in attempting to pursue her course to Boston. This recitation of facts likewise disposes of the charge made in the libel, but apparently thereafter abandoned, that the New Mexico failed to stand by the Oregon after the collision.

The foregoing lengthy discussion has, I think, sufficiently disclosed the views of the Court on all material matters of fact and of law. However, they may be more briefly and definitely stated as follows:

## Findings of Fact.

1. This collision occurred about 4:42 or 4:43 in the morning of December 10, 1941, at a point in the Atlantic Ocean about 40 miles south of Nantucket Shoals Lightship. Visibility for unlighted objects such as ships of the size involved was around two miles with the naked eye.

2. The courses and speeds of the ships preceding the collision, as testified by their respective officers, were: The Oregon was proceeding on a course of 340 degrees true at a speed of between 13.5 and 14 knots; the New Mexico on a course of 216 degrees true at a speed of 14 knots. The latter course and· speed was also that of the three destroyers accompanying the New Mexico. All ships were proceeding without lights and none of them was equipped with radar.

3. The New Mexico sighted the loom of the Oregon, by means of binoculars, when the latter was distant about two and a half miles, but at that time was unable to identify the Oregon. The destroyers Sims and Hughes sighted the Oregon at approximately the same time that the New Mexico did. On sighting the Oregon, the New Mexico did not at once turn on her lights but proceeded on her course and speed while keeping the Oregon under· observation. During this time it became apparent to the New Mexico that she and the Oregon were probably on collision courses.

4. The Oregon sighted the loom of the New Mexico when about one mile or a little more distant from the latter. On sighting the New Mexico the Oregon immediately turned on her lights and within 20 seconds thereafter the New Mexico be-

came lighted. Both vessels became lighted when they were from 1500 to 2200 yards apart.

5. When both vessels became lighted it was apparent, or should have been apparent, to each of them that they were on crossing and probably collision courses. At all time the Oregon's bearing from the New Mexico was well on the latter's port bow and the New Mexico was bearing well on the Oregon's starboard bow.

.6. When both vessels had become lighted and it was apparent to both that they were on crossing courses, the Oregon had adequate time to avoid crossing ahead of the New Mexico by stopping or slackening her speed or by turning to her right. However, the Oregon, from the time of sighting the New Mexico and thereafter, continued her course and speed until approximately a minute before the collision when she turned to her left across the course of the New Mexico in an attempt to avoid collision. The Oregon at no time prior to the collision slackened her speed nor did she give any signal of her intentions or plan of conduct.

7. From the time of sighting the Oregon, both before and after both ships were lighted, the New Mexico continued her course and speed until approximately a minute before the collision, at which time she turned hard to her right in an effort to avoid a collision, at the same time reversing her engines and sounding a blast on her siren. At the time of the collision both ships had turned from their original courses and they collided in such manner as that the stem of the New Mexico struck the starboard side of the Oregon at an angle of somewhere between 25 and 45 degrees.

8. The destroyers, The Sims, The Hughes, and The Russell, were at all pertinent times approximately on their stations, as described in the evidence. The Oregon entered the naval formation between the Sims and the Hughes about 1,000 to 1200 yards to port of the Hughes and about 1400 or 1500 yards to starboard of the Sims. Both The Sims and The Hughes signalled the Oregon with blinker tube when the Oregon was about entering the screen, or possibly shortly before. The Oregon did not see these signals and had no knowledge of the presence of any of the destroyers until she had turned left immediately before the collision with the New Mexico. The navigation of the Oregon was not affected by the presence of the destroyers.

9. Following the collision, all ships remained in the vicinity and in communication with each other for about an hour or more while the Oregon examined her damage, after which the Oregon, believing it was safe to do so, proceeded on her course accompanied by the Sims as an escort. After proceeding for about four hours or more, at which time she had reached Nantucket Shoals Lightship, the Oregon informed the Sims that there was no further need for her to stand by and dismissed her. The Oregon at no time after the collision requested any further aid of any sort from any of the naval vessels.

10. When the Oregon reached Nantucket Shoals Lightship, the conditions of the weather and sea were such as to justify the master of the Oregon in believing that he could complete his voyage to Boston in safety and he proceeded on the prescribed course to that port. About an hour later, however, a sudden and unexpected change in the direction and force of the wind caused rising seas which caused the Oregon to take water beyond the power of her pumps to control, with the result that the ship finally sank between 1:00 and 2:00 p. m. of the same day with the total loss of the ship and cargo and the loss of the lives of seventeen members of the crew.

### Conclusions of Law.

1. The situation preceding this collision was such as to make applicable those provisions of the International Rules for Navigation dealing with steam vessels on crossing courses, the pertinent and applicable provisions of the Rules being Articles 19, 21, 22, 23, and 29 thereof.

2. There existed no special circumstances or emergency which (under Article 27) rendered the crossing rules inapplicable or which justified a departure from, or failure to comply with, them.

3. Under the rules, the Oregon was the burdened vessel and imposed with the duty to keep out of the way of the New Mexico and to avoid crossing ahead of the New Mexico (Articles 19 and 22).

4. The New Mexico was under the duty to maintain her course and speed until such time as it became apparent to her that a collision could not be averted by the action of the Oregon alone.

5. The Oregon was in fault in the following respects, which were the direct, and proximate, and sole causes of the collision:

(a) She failed to keep a proper lookout.

(b) She failed to take proper precautions when she first sighted the New Mexico on her starboard side.

(c) After the ships were lighted and it was disclosed that they were on crossing courses, she continued her course and speed and failed to make any effort to keep out of the way of the New Mexico and to avoid crossing ahead while there was adequate time to have taken avoiding action.

(d) When turning to her left immediately before the collision, she failed to give any warning of her change of course.

6. The New Mexico was not at fault in not turning on her lights immediately on sighting the Oregon.

7. When both ships had become lighted and it was disclosed that they were on crossing courses, the New Mexico was not negligent in pursuing her course and speed, but acted properly in doing so up until the time when it became apparent to her that the Oregon's action alone could not avert a collision.

8. The action which the New Mexico took in an effort to avoid the collision was as complete as possible under the conditions existing and was appropriate to the situation confronting her.

9. The New Mexico did not fail to stand by the Oregon following the collision and was not negligent in any duty owing the Oregon after the collision.

10. None of the destroyers, or their officers or personnel, were negligent in the performance of their duties and no acts or omissions of theirs caused or contributed to the collision.

11. The master of the Oregon was not negligent in undertaking to proceed to Boston.

12. As the evidence establishes that the M. V. Oregon was seaworthy and that her owner, Pacific-Atlantic Steamship Co., had no privity or knowledge of any faults or errors in her navigation by her master, officers or crew which caused or contributed to the collision and the resulting loss of the vessel and her cargo, the said Pacific-Atlantic Steamship Company is entitled to statutory limitation of liability as prayed for in its petition herein; and, in the said limitation proceeding of petitioner, Pacific-Atlantic Steamship Co., the claimants E. J. Lavino & Company, Inc., and Reconstruction Finance Corporation, owners of cargo lost on the M. V. Oregon, are not entitled to any recovery against the said petitioner.